985 P.2d 604

**In re the Matter of Kathryn Lucille GRA-VILLE and Donald Graville, Petitioners–Appellees, Cross Appellants,**

**v.**

**Douglas Paul DODGE, Respondent–Appellant, Cross Appellee.**

**Nos. 1 CA–CV 98–0104, 1 CA–CV 98–0150.**

Court of Appeals of Arizona, Division 1, Department B.

Jan. 28, 1999.

Review Denied Sept. 21, 1999.

Stanley David Murray, P.C. by Stanley, David Murray, Phoenix, for Petitioners–Appellees/Cross Appellants.

Roberts, Rowley & Smith, Ltd. by Paul S. Rowley, Scott F. Gibson, Mesa, Attorneys for Respondent–Appellant/Cross Appellee.

OPINION

RYAN, Judge.

¶ 1 The court below awarded the maternal grandparents visitation with the children of their deceased daughter. On appeal, the children's father challenges the constitutionality of the grandparent visitation statute, Arizona Revised Statutes Annotated ("A.R.S.") section 25–409. He also argues that the amount of visitation awarded is excessive and that the findings made by the trial court do not support the award. We conclude that the statute is constitutional and affirm the court's visitation order with modification.

## I.

¶ 2 In March 1988, David Dodge ("Dodge") married Gayla Graville, the daughter of Donald and Lucille Graville ("the Gravilles"). The couple had two daughters; Victoria ("Tori") was born August 2, 1989, and Kacy was born August 10, 1990.

¶ 3 During the marriage, Dodge served in the United States Army. Because of his military assignments, Gayla and the children were unable to live with him at times. Between August 1989 and October 1991, Gayla, Tori, and Kacy lived either with the Gravilles or with Gayla's sister, Cheryl, except for about eight months during which they lived in Germany with Dodge. In October 1991, Dodge returned to the United States and the family lived together in Maryland.

¶ 4 Shortly after Kacy was born, doctors diagnosed Gayla with kidney disease. In the summer of 1992, Gayla was hospitalized for an extended time in Washington, D.C. During that summer, Lucille and Dodge's sister, Nancy, both spent time in Maryland to care for the girls while Gayla was in the hospital. In August 1992, Tori and Kacy returned to Phoenix with Lucille and lived with the Gravilles. Gayla joined them in October.

¶ 5 Dodge and Gayla were divorced in May 1993. Gayla was awarded custody of the children, and they continued to live with the Gravilles.

¶ 6 Gayla married Joe Robinson in August 1993. She and the girls lived in Avondale with Robinson from August 1993 until March 1995, when they moved back to the Gravilles' home. Gayla and Robinson were divorced in May 1995.

¶ 7 During the summer of 1995, Gayla and the girls moved to the home of Dodge's parents, where they lived for about two months. On September 16, 1995, Gayla had a seizure and was hospitalized. After her release from the hospital, she and the girls returned to the Gravilles' home where they lived until Gayla's death on August 26, 1996.

¶ 8 After Gayla died, Tori and Kacy moved to the home of Dodge and his new wife, Andrea.[1] The girls visited the Gravilles three or four times after Gayla's death, including a visit on August 30, 1996, the day of Gayla's funeral. Dodge stated that the girls had a "very nasty attitude" toward him and Andrea and that they were hard to control after they visited with the Gravilles. He believed the Gravilles were openly criticizing his decisions concerning which school and church the girls attended. Dodge also stated that Tori had nightmares about being taken away by the Graville family. He believed that the Gravilles drank alcohol and smoked in their home and was concerned about the effects of those habits on his daughters. He was also concerned about what he described as a "pantsing" incident in which Donald allegedly pulled down Tori's pants at a reception following Gayla's funeral.

¶ 9 For these reasons, in mid-September 1996, Dodge informed the Gravilles that he had decided to discontinue their visitation with the girls for a time. He felt it was in the best interests of his daughters to suspend visitation indefinitely "until they got settled down." Despite intervention by third parties who urged resolution of the visitation dispute, Dodge refused to allow the Gravilles to visit with the girls.

¶ 10 In early 1997, the Gravilles filed a petition seeking visitation with Tori and Kacy. The case went to trial in September 1997.

¶ 11 Before trial, the court appointed Dr. Marlene Joy to evaluate whether it was in the children's best interests to have visitation with the Gravilles. She testified that the girls wanted and needed to have a relationship with their grandparents and their maternal family. She recommended that visitation begin immediately in public places to allay Dodge's objections to the Gravilles' home environment. Dr. Joy noted that the Gravilles and some of Gayla's other relatives had been with the girls on almost a daily basis for several years and had been vital influences in the girls' lives. She stated that a severance of their relationship with their maternal grandparents likely would be detrimental to the girls' well-being.

¶ 12 Lucille testified that she had not smoked in more than a year and had not consumed alcohol in more than three years. Donald testified that he did not smoke around his grandchildren, and he smoked outside. They both denied telling Dodge that they had pulled Tori's pants down. Three witnesses testified concerning the good character of Lucille and Donald and their abilities to work with children.

¶ 13 The trial court granted the Gravilles visitation with their granddaughters for four to eight hours twice a month, two days during Christmas break, and a three-day weekend during the summer. The court denied Dodge's request to stay enforcement of the order.[2] The court also denied the Gravilles' request for an award of their attorneys' fees.

---

1. At the time of the trial, Andrea was in the process of adopting Dodge's daughters.

2. This court also denied a request made by Dodge to stay the trial court's visitation order.

¶ 14 Dodge appealed from the visitation order and from a separate order awarding the Gravilles costs of $2,496.50. The Gravilles cross-appealed from the denial of their request for an award of attorneys' fees.

## II.

### A.

¶ 15 Dodge initially argues that the grandparent visitation statute is unconstitutional because it interferes with a parent's fundamental right to exercise custody and control over the parent's minor child. He asserts that the state may not interfere with this fundamental right unless there is evidence indicating that the children will be harmed if the state does not interfere.

¶ 16 The Gravilles respond that even though parents have a fundamental right to raise their children as they choose, the state may impose reasonable regulations that do not substantially interfere with that right. They also note that the state's *parens patriae* power to act in the best interests of a child may override a parent's fundamental right to raise the child. They assert that Arizona's grandparent visitation statute demonstrates a compelling state interest in protecting the best interests of children.

¶ 17 We presume a statute to be constitutional and will not declare an act of the legislature unconstitutional unless convinced beyond a reasonable doubt that it conflicts with the federal or state constitutions. *Chevron Chem. Co. v. Superior Court,* 131 Ariz. 431, 438, 641 P.2d 1275, 1282 (1982). The party asserting that a statute is unconstitutional has the burden to demonstrate that it is. *Tucson Elec. Power Co. v. Apache County,* 185 Ariz. 5, 11, 912 P.2d 9, 15 (App. 1995). We review *de novo* a challenge to the constitutionality of a statute. *Little v. All Phoenix S. Community Mental Health Ctr., Inc.,* 186 Ariz. 97, 101, 919 P.2d 1368, 1372 (App.1995).

¶ 18 Under the common law, grandparents had no legal rights to visitation with their grandchildren. *Sands v. Sands,* 157 Ariz. 322, 323, 757 P.2d 126, 127 (App.1988). However, all fifty states have adopted grandparent visitation statutes. *See Michael v. Hertzler,* 900 P.2d 1144, 1151–53 (Wyo.1995) (appendix A listing state statutes). In 1983, the Arizona legislature enacted a grandparent visitation statute, now at A.R.S. section 25–409. Laws 1983, Ch. 109, § 1. In relevant part, the statute provides:

A. The superior court may grant the grandparents of the child reasonable visitation rights to the child during his minority on a finding that the visitation rights would be in the best interests of the child and ... the following [is] true:

\* \* \* \*

2. A parent of the child has been deceased ... for at least three months.

\* \* \* \*

C. In determining the child's best interests the court shall consider all relevant factors, including:

1. The historical relationship, if any, between the child and the person seeking visitation.

2. The motivation of the requesting party in seeking visitation.

3. The motivation of the person denying visitation.

4. The quantity of visitation time requested and the potential adverse impact that visitation will have on the child's customary activities.

5. If one or both of the child's parents are dead, the benefit in maintaining an extended family relationship.

\* \* \* \*

F. All visitation rights granted under this section automatically terminate if the child has been adopted or placed for adoption.... This subsection does not apply to the adoption of the child by the spouse of a natural parent if the natural parent remarries.

¶ 19 Dodge correctly points out that parents have a constitutionally protected right under the Fourteenth Amendment to raise their children as they see fit. *See, e.g., Moore v. City of East Cleveland, Ohio,* 431

U.S. 494, 499, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) ("freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment"); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944) ("custody, care and nurture of the child reside first in the parents"); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (liberty interest guaranteed by the Fourteenth Amendment includes freedom "to marry, establish a home and bring up children"). Arizona also acknowledges this fundamental right. *See, e.g., Stewart v. Maricopa County Superior Court,* 163 Ariz. 227, 229, 787 P.2d 126, 128 (App.1989) (parents have fundamental liberty interest in care, custody, and management of their children); *Maricopa County Juv. Action No. JS–5209 and No. JS–4963,* 143 Ariz. 178, 182, 692 P.2d 1027, 1031 (App.1984) (parents' right to custody and control of their children is a fundamental constitutional right).

¶ 20 Although a parent's right to custody and control is constitutionally protected, it is not without limit or beyond regulation. Under their constitutional powers, states may regulate the well-being of children. *Ginsberg v. New York,* 390 U.S. 629, 639, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). The Supreme Court has noted that a "state has a wide range of power for limiting parental freedom" and thus "may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor and in many other ways." *Prince,* 321 U.S. at 166–67, 64 S.Ct. 438. Examples of permissible state interference with parental control include requiring that children be inoculated against disease, that they not be abused or neglected, and that they be restrained when riding in motor vehicles. *See, e.g., Sightes v. Barker,* 684 N.E.2d 224, 229 (Ind. Ct.App.1997); *King v. King,* 828 S.W.2d 630, 631 (Ky.1992); *R.T. v. J.E.,* 277 N.J.Super. 595, 650 A.2d 13, 14 (1994); *Campbell v. Campbell,* 896 P.2d 635, 641 n. 13 (Utah Ct.App.1995).

¶ 21 The degree of the state's infringement of a fundamental right is an important consideration in deciding what level of review the court should apply in determining whether the challenged statute is constitutional. *See Campbell,* 896 P.2d at 641–42. Justice O'Connor noted that not every state regulation that impinged on a fundamental right had to be examined with strict scrutiny:

The requirement that state interference "infringe substantially" or "heavily burden" a right before heightened scrutiny is applied is not novel in our fundamental-rights jurisprudence, or restricted to the abortion context. In *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 37–38 [93 S.Ct. 1278, 36 L.Ed.2d 16] (1973), we observed that we apply "strict judicial scrutiny" only when legislation may be said to have " 'deprived,' 'infringed,' or 'interfered' with the free exercise of some such fundamental right or personal liberty." If the impact of the regulation does not rise to the level appropriate for our strict scrutiny, then our inquiry is limited to whether the state law bears "some rational relationship to legitimate state purposes." *Id.,* at 40 [93 S.Ct. 1278]. Even in the First Amendment context, we have required in some circumstances that state laws "infringe substantially" on protected conduct, *Gibson v. Florida Legislative Investigation Committee,* 372 U.S. 539, 545 [83 S.Ct. 889, 9 L.Ed.2d 929] (1963), or that there be "a significant encroachment upon personal liberty," *Bates v. City of Little Rock,* 361 U.S. 516, 524 [80 S.Ct. 412, 4 L.Ed.2d 480] (1960).

*City of Akron v. Akron Ctr. for Reproductive Health, Inc.,* 462 U.S. 416, 462–63, 103 S.Ct. 2481, 76 L.Ed.2d 687, (1983) (O'Connor, J., dissenting), *overruled by Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 838, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

¶ 22 In a similar vein, the Supreme Court addressed permissible state infringement on a person's fundamental right to marriage in *Zablocki v. Redhail,* 434 U.S. 374, 386, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). There, the Court stressed that every state regulation that related to the right to marry need not be subjected to strict scrutiny. Instead, explained the *Zablocki* Court, "rea-

sonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed." *Id.* Thus, when a law does not substantially infringe upon a person's fundamental rights we examine the challenged statute under the rational basis standard of review. That is, we will uphold the law if it is reasonably related to a legitimate state objective. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 40, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

 ¶ 23 Examining A.R.S. section 25–409 with this principle in mind, we conclude that its provision for grandparent visitation does not substantially infringe on parents' fundamental rights. Other courts have noted that " '[g]ranting visitation is a far lesser intrusion, or assertion of control, than is an award of custody' and thus not nearly as invasive of parents' rights." *Roberts v. Ward*, 126 N.H. 388, 493 A.2d 478, 482 (1985) (quoting *Krieg v. Glassburn*, 419 N.E.2d 1015, 1019 (Ind.Ct.App.1981)). Grandparent visitation is not automatic, even if the petitioning grandparent meets one of the qualifications in A.R.S. section 25–409(A)(1)–(3). The statute permits reasonable visitation only if the trial court finds visitation to be "in the best interests of the child." A.R.S. § 25–409(A). The statute also requires the court to consider a number of relevant factors to focus its analysis on the best interests of the child. A.R.S. § 12–409(C). These factors include the quantity of visitation time requested and the impact that visitation might have on the child's customary activities. Thus, the statute is structured to enable the court to make grandparent visitation a minimal burden on the rights of the child's parents.

¶ 24 Because the statute neither substantially interferes with nor heavily burdens parental rights, we determine whether it passes constitutional muster by examining whether the grandparent visitation statute has a "rea-

sonable relation to some purpose within the competency of the state." *See Pierce v. Society of Sisters*, 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *People ex rel. Sibley v. Sheppard*, 54 N.Y.2d 320, 445 N.Y.S.2d 420, 429 N.E.2d 1049, 1052 (1981). In other words, we consider whether the statute bears "some rational relationship to legitimate state purposes." *See Rodriguez*, 411 U.S. at 40, 93 S.Ct. 1278.[3]

¶ 25 In adopting a grandparent visitation statute, the state "has determined that, under certain limited circumstances, grandparents should have continuing contacts with the child's development if it is in the child's best interest." *Sibley*, 445 N.Y.S.2d 420, 429 N.E.2d at 1052. Particularly when, as here, a parent of the child has died, we presume that the legislature intended that when "a relationship between the grandparents and grandchild has been established, the child should not undergo the added burden of being severed from his or her grandparents." *Id.*

¶ 26 It is apparent from Arizona's grandparent visitation legislation that our lawmakers determined that extended family and generational relations should be encouraged. Given the instability of the nuclear family prevalent in modern society, it is not unreasonable for the legislature "to attempt to strengthen intergenerational ties as an alternative or supplementary source of family support for children." *Campbell*, 896 P.2d at 643. Thus, it is quite reasonable for the state to support the continuation of caring relationships between family members, particularly among grandchildren and their grandparents. *See King*, 828 S.W.2d at 632. The state has an interest in promoting healthy family relationships that enable children to become well-adjusted, responsible adults. The statute in question promotes these goals by providing for visitation with grandparents when it is shown to be in the best interests of the child.

---

3. In contrast, the Wyoming Supreme Court in *Michael v. Hertzler* decided that because the right to associate with one's family is a fundamental constitutional right, the strict scrutiny test must be used to determine whether the grandparent visitation statute is constitutional. 900 P.2d 1144, 1147–48 (Wyo.1995). However, even un-

der that standard, the *Michael* court held that the statute was constitutional, reasoning that the state had a compelling interest in ensuring that the best interest of the child was met and that the right of association of grandparents and grandchildren was maintained. *Id.* at 1149–51.

¶ 27 We therefore conclude that A.R.S. section 25–409 is rationally related to furthering the state's legitimate interest in enabling children to become responsible adults by fostering relationships between grandchildren and their grandparents. We thus hold that the statute is constitutional. In so holding, we are in agreement with the majority of the courts in the nation that have upheld similar grandparent visitation statutes as constitutional.[4]

¶ 28 Dodge nevertheless points out that a few courts have found their grandparent visitation statutes to be unconstitutional. In two of those cases—*Brooks v. Parkerson*, 265 Ga. 189, 454 S.E.2d 769 (1995) and *Hawk v. Hawk*, 855 S.W.2d 573 (Tenn.1993)—the grandparents sought visitation when the families of the children were intact and the biological parents of the children agreed that the grandparents should not see the children. The applicable statutes allowed such visitation in intact biological families. Those courts found the statutes to be unconstitutional, reasoning that the state could not intrude upon parents' fundamental right to raise their children unless it was shown that denial of grandparent visitation would be harmful to the welfare of the child.

¶ 29 Arizona's statute does not allow for court-ordered grandparent visitation when the child's natural family is intact. Different policy concerns arise from the state's interest in encouraging the grandparent-grandchild relationship under circumstances in which a parent is deceased than when it occurs with an intact natural family. These concerns persuade us that the reasoning used by courts in intact natural family situations should not apply here.

¶ 30 Dodge also cites to Florida court rulings for support. In *Beagle v. Beagle*, 678 So.2d 1271, 1276 (Fla.1996), the supreme court held that parents had a fundamental right under the state constitution to raise their children without state interference except when a child was threatened with harm. There the court held that a statute allowing grandparent visitation over an objection by the parents of an intact family violated the fundamental rights of parents. Later that court in *Von Eiff v. Azicri*, 720 So.2d 510 (Fla.1998), extended *Beagle* to apply to the portion of the statute that allowed grandparent visitation when it was in the best interests of the child and one or both of the child's parents were deceased. It held that this subsection mandating that the court "shall" award grandparents visitation was facially unconstitutional. *Von Eiff*, 720 So.2d at 517; *See also Fitts v. Poe*, 699 So.2d 348 (Fla.Dist. Ct.App.1997).

¶ 31 We find the holdings of the Florida courts unpersuasive based on the difference in the language of its grandparent visitation statute. The Florida statute mandates the court to grant visitation to grandparents who meet the criteria of the statute. In relevant part it provides:

> The court *shall*, upon petition filed by a grandparent of a minor child, award reasonable rights of visitation to the grandparent with respect to the child when it is in the best interest of the minor child. . . .

Fla. Stat. Ann. § 752.01(1) (West 1993) (emphasis added).

¶ 32 The Florida cases finding the visitation statute unconstitutional were analyzed under a strict scrutiny standard based on the Florida Constitution's explicitly broad right of privacy. *See Beagle*, 678 So.2d at 1275–76; *Von Eiff*, 720 So.2d at 513–14. These courts applied this privacy provision to protect parents from government intrusion into family matters, finding that the statute, as written, did not demonstrate a compelling state interest that permitted interference. *See Beagle*,

---

4. In the following cases, courts found grandparent visitation statutes to be constitutional: *Cockrell v. Sittason*, 500 So.2d 1119, 1121 (Ala.Civ. App.1986); *West v. West*, 294 Ill.App.3d 356, 228 Ill.Dec. 794, 689 N.E.2d 1215, 1221 (1998); *Sightes*, 684 N.E.2d at 233; *Spradling v. Harris*, 13 Kan.App.2d 595, 778 P.2d 365, 368 (1989); *King*, 828 S.W.2d at 632; *Petition of Santoro*, 578 N.W.2d 369, 381 (Minn.Ct.App.1998); *Martin v. Coop*, 693 So.2d 912, 915 (Miss.1997); *Herndon v. Tuhey*, 857 S.W.2d 203, 208 (Mo.1993); *R.T.*, 650 A.2d at 16; *Ridenour v. Ridenour*, 120 N.M. 352, 901 P.2d 770, 774 (N.M.Ct.App.1995); *Sibley*, 445 N.Y.S.2d 420, 429 N.E.2d at 1052; *Hedrick v. Hedrick*, 90 N.C.App. 151, 368 S.E.2d 14, 18–19 (1988); *Hollingsworth v. Hollingsworth*, 34 Ohio App.3d 13, 516 N.E.2d 1250, 1253 (1986); *Campbell*, 896 P.2d at 643; *Michael*, 900 P.2d at 1151.

678 So.2d at 1275–76; *Von Eiff,* 720 So.2d at 513–14.

¶ 33 However, because the language in A.R.S. section 25–409 substantially differs from that found in Florida's grandparent visitation statute, Arizona's statute is more appropriately reviewed under a rational basis standard.[5] Unlike Florida's statute, which mandates visitation, Arizona's statute does not afford an absolute right of visitation to grandparents, but rather leaves it to the court's discretion. *See* A.R.S. § 25–409(A). Moreover, Arizona's statute requires the court to consider at least five specific factors in determining the best interest of the child. Also, if the court decides to grant visitation, the order must be as minimally intrusive as possible. *See* A.R.S. § 25–409(C)(4). These differences are important because "[i]t shows that the legislature was conscious of parents' superior right to the custody and care of their children." *West v. West,* 294 Ill.App.3d 356, 228 Ill.Dec. 794, 689 N.E.2d 1215, 1221 (1998). Therefore, because Arizona's grandparent visitation statute does not substantially interfere with a parent's fundamental right to raise his child, we believe that the appropriate standard of review is a rational basis standard rather than strict scrutiny. Thus, the reasoning of the Florida courts is not helpful to our analysis and does not change our conclusion that A.R.S. section 25–409 is constitutional.

¶ 34 Finally, relying on *Cochise County Juv. Action No. 5666–J,* 133 Ariz. 157, 161, 650 P.2d 459, 463 (1982), Dodge argues that a parent's right to exercise control over his children may be invaded only "[i]f the interest of the state is great enough—that is, if the welfare of the child is seriously jeopardized...." We find *No. 5666–J* distinguishable from this case. In *No. 5666–J,* the state asked the court to adjudge the children dependent so that it would have legal custody of the children and thus all rights of parenthood. As noted above, a request for limited grandparent visitation is much less of a burden on the parents' rights than giving the state total legal custody and control of children. Therefore, we decline to extend the holding of *No. 5666–J* to require a showing of harm to the children before allowing the trial court to grant a grandparent's request for visitation under A.R.S. section 25–409.

**B.**

¶ 35 Dodge argues that the amount of visitation awarded is excessive and unreasonable, making the trial court's application of the statute unconstitutional. He also asserts that other provisions of the order—such as directing him to encourage weekly telephone calls between the girls and the Gravilles, ordering him to consider the Gravilles as caregivers when needed, and ordering him to refrain from discussing custody and other legal issues with the girls—are beyond the authority given by A.R.S. section 25–409 and constitute an unconstitutional interference with his fundamental parental rights.

¶ 36 The trial court ordered that the Gravilles be allowed access to their granddaughters at least twice a month for four to eight hours each time. The court also ordered that, at a minimum, two days over the Christmas break and one three-day weekend during the summer be offered as vacation access time for the Gravilles. This amount of visitation time was recommended by Dr. Joy, the court-appointed expert. Dodge argues that this amount of visitation is inappropriate because it is akin to the visitation time a non-custodial parent would expect. We disagree.

¶ 37 Under the order, the Gravilles may see the girls as little as eight hours per month plus five other days during school vacation periods. Thus, the grandparents may have visitation with their granddaughters for only the equivalent of nine 24–hour days during each year. This amount of time is hardly equivalent to what a non-custodial parent would expect.

---

**5.** In distinguishing the Florida cases, the Gravilles contend that those cases were based solely upon Florida's unique state constitutional right of privacy, a constitutional right which the *Beagle* court stated only occurs in Arizona in search and seizure cases. *See Beagle,* 678 So.2d at 1275

n. 9. But, because of the differences between Florida's grandparent visitation statute and Arizona's, we find it unnecessary to decide whether Arizona's constitutional right of privacy is limited to search and seizure cases.

¶ 38 Section 25–409 contemplates that it is within the discretion of the trial court to determine reasonable grandparent visitation that is in the best interests of the child. Therefore, review of the trial court's decision concerning the amount of visitation awarded is taken under substantial evidence and abuse of discretion standards. *See Ridenour v. Ridenour*, 120 N.M. 352, 901 P.2d 770, 774 (N.M.Ct.App.1995). *Cf. Armer v. Armer*, 105 Ariz. 284, 289, 463 P.2d 818, 823 (1970) (trial court has broad discretion in granting parental visitation rights because it is in most favorable position to determine what is best for the children).

¶ 39 We conclude that the visitation awarded here is reasonable and does not constitute an abuse of discretion. An award of eight hours a month plus five days annually during vacation periods is certainly not excessive when the children spent extended periods of their young lives living in the grandparents' home. In addition, the visitation time ordered is minimally intrusive on the life of Dodge, his wife, and the girls because the order does not specify a day of the week on which the visitation must take place; visitation times are flexible and can be worked around the schedules of the Dodge family members.

¶ 40 Dodge also takes issue with the parts of the order that direct him to encourage weekly telephone calls between the girls and the Gravilles, to consider using the Gravilles as potential caregivers if he or his wife is unavailable to care for the girls, to refrain from discussing custody and other legal issues with the girls, to advise the Gravilles of any changes to his address or telephone number, and to notify the Gravilles of any emergency or other important event that involves the children. Admittedly, some of the orders—such as considering the Gravilles as caregivers—are precatory and largely unenforceable by the court. However, they constitute the trial court's commendable attempt to give the parties guidance as to behavior that will further the visitation process and limit potential damage to the children from the inability of their adult family members to get along with each other.

¶ 41 Nothing in A.R.S. section 25–409 specifically gives the court authority to make orders of this type. While we believe the trial court has inherent authority to issue orders as part of its duty to fashion a visitation plan that is in the best interests of the children, we believe that a court must confine its exercise of that authority within the limits of the statute. Our decision upholding the statute rests on the fact that the statute does not substantially interfere with the parents' rights to custody and control over the child. When an order issued under the statute substantially interferes with the parents' rights to custody and control, the court is operating outside the limits imposed and therefore outside its authority. In such circumstances, the court's order amounts to an unconstitutional application of a facially valid statute.

¶ 42 Here, the orders requiring Dodge to provide the Gravilles with telephone number and address changes and to keep the Gravilles informed about important events involve only minimal interference with Dodge's parental control and are therefore permissible exercises of the court's authority under the statute. The orders requiring Dodge to encourage weekly telephone calls, to consider the Gravilles as potential babysitters, and to refrain from discussing custody issues with the children, however, may implicate more sensitive areas of parental control. Although these orders provide Dodge with sound practical advice to reduce the tension between the parties, the orders impinge directly on Dodge's parental communication with his children. This intrudes directly upon Dodge's ability to exercise parental control and amounts to an unconstitutional exercise of the court's authority granted by the statute. Therefore, we strike the trial court's orders directing Dodge to encourage weekly telephone calls, to consider the Gravilles as alternative caregivers, and to refrain from discussing custody matters with the girls.

### C.

¶ 43 Dodge argues that the Gravilles failed to prove that visitation was in the best interests of the children. He asserts that neither Dr. Joy nor the trial court articulated any

reasons why visitation was in the best interests of the girls.

¶44 Dodge argues that the required standard of proof for the best interests of the children is clear and convincing evidence. However, the statute is silent as to the required burden of proof. Nevertheless, we do not have to decide this issue because a trial court's findings will be sustained on appeal as long as the record contains substantial evidence to support them even if the standard below was clear and convincing. *See Estate of Page v. Litzenburg,* 177 Ariz. 84, 92, 865 P.2d 128, 136 (App.1993). Moreover, as noted above, when visitation with a child is involved, the trial court is in the best position to determine the best interests of the children. *See Armer,* 105 Ariz. at 289, 463 P.2d at 823.

¶45 We conclude that the evidence supports the trial court's finding that visitation with the Gravilles was in the girls' best interests. Dr. Joy testified that the girls want and need to have a relationship with their grandparents and their maternal family. Denying them visitation, Dr. Joy said, would indicate to the girls that once a person in their lives dies, other people associated with that person become disposable. She also testified that because the Gravilles and other maternal relatives had been a vital influence on the children and had seen them on almost a daily basis for several years, eliminating those relationships would likely be detrimental to the well-being of the children. Therefore, Dr. Joy opined that it would be in the best interests and welfare of the girls to be allowed regular contact with the Gravilles.

¶46 Other testimony indicated that the Gravilles were of suitable character to have visitation with the girls and that they would not expose the children to cigarette smoke. The findings of the trial court referred to the amount of time the girls lived in the Graville home and to Dr. Joy's opinion that the continuation of their relationships with their maternal grandparents was in the best interests of the girls. The court specifically found that the ordered visitation and accompanying orders were in the best interest of Tori and Kacy. These findings are adequate for our review, and the order complies with the best interests of the children requirement of A.R.S. section 25–409.

¶47 Dodge also argues that the trial court refused to consider evidence related to the customary activities of the children, pointing out that A.R.S. section 25–409(C)(4) requires the court to consider the impact visitation will have on such activities. Even if Dodge's argument is correct, the trial court's failure to consider evidence on this topic does not constitute reversible error. As noted above, the visitation times are flexible as to times of day and days of the week and amount to as little as eight hours a month. Therefore, the court crafted the award of visitation so that it could be worked around the girls' customary activities. Accordingly, the court did not err if it failed to explicitly take into account the children's customary activities.

**D.**

¶48 Dodge argues that the trial court found two facts for which there is no support in the record. One finding erroneously states that Gayla and Dodge were divorced on August 15, 1995, when, in fact, the couple's divorce was final on May 26, 1993. While this statement of fact is erroneous, it is a background fact that is largely irrelevant to the award of visitation. Disregarding it has no effect on the award of visitation.

¶49 The second finding of fact challenged by Dodge states:

16. Dr. Joy testified that after lengthy absence (mid September 1996 to early July 1997) of the children from the Gravilles', [sic] and at the first meeting in her office (July 2nd) that "upon first seeing the Gravilles', [sic] the children spontaneously ran smiling and happily to embrace their Grandma and Grandpa."

We cannot find this quoted testimony in either Dr. Joy's report, her deposition testimony, or her trial testimony, and the Gravilles have not cited this testimony to us. Dr. Joy did testify in her deposition that "when I told them that the grandparents would be leaving [her office], unsolicited by anyone [they] ran

up, ran to each of the grandparents and gave hugs and kisses . . . ."

¶ 50 The obvious reason for including the statement in paragraph sixteen of the findings of fact is to show the affection the girls felt for the Gravilles. While the record does not appear to contain that statement, it does contain a similar account by Dr. Joy that also shows the affection the children have for their grandparents. Therefore, although paragraph sixteen does not accurately quote from the record, the proposition for which the quote is offered is supported by other testimony in the record. Accordingly, the erroneous statement is not fatal to the visitation award.

### E.

¶ 51 Dodge argues that the trial court lacked jurisdiction to award the Gravilles their taxable costs after he filed his notice of appeal and the Gravilles filed their notice of cross-appeal. He also maintains that some of the costs awarded by the trial court to the Gravilles are not authorized by statute and are otherwise improper.

¶ 52 An award of costs to the prevailing party in a civil action is a matter of right—the superior court has no discretion to deny costs to the successful party. A.R.S. § 12-341; *Roddy v. County of Maricopa,* 184 Ariz. 625, 627, 911 P.2d 631, 633 (App.1996). Rule 58(a), Arizona Rules of Civil Procedure, provides that "entry of the judgment shall not be delayed for taxing costs." Considering that an award of costs is a matter of right, the trial court does not lose jurisdiction to assess costs once a notice of appeal is filed.

¶ 53 The trial court has discretion to determine whether a challenged item falls within the definition of taxable costs. *See Fowler v. Great American Ins. Co.,* 124 Ariz. 111, 114, 602 P.2d 492, 495 (App.1979) (holding travel expenses incurred in taking depositions qualified as costs incurred in taking deposition). Dodge argues that the court should not have allowed a filing fee and certain subpoena fees because they were unnecessary. The trial judge was in the best position to determine whether those costs were warranted. We find no indication that the trial court abused its discretion in assessing those costs against Dodge. Therefore, we decline to reverse the assessment of these costs.

¶ 54 Dodge also argues that A.R.S. section 12-332 does not allow the Gravilles to recover as a taxable cost the fees of Dr. Joy, a court-appointed witness. However, we interpret A.R.S. section 12-332(A)(6) as allowing this assessment. That paragraph provides that costs in the superior court include "[o]ther disbursements made or incurred pursuant to an order . . . ." The court ordered the appointment of Dr. Joy to interview the parties and the children and to make a report to the court. It ordered the Gravilles to pay her fees "subject to other and further orders of the Court." Because the payment of Dr. Joy's fees was made under the court's order, the court had the authority to assess Dr. Joy's fees against Dodge under A.R.S. section 12-332(A)(6) once the Gravilles become the prevailing parties. Furthermore, just as the court had the authority to order the Gravilles to pay Dr. Joy's fees, it also had the authority to order Dodge to pay the fees—even without the assessment of costs statute—and it reserved the right to do so at a later time. In addition, the court could have awarded costs not listed in A.R.S. section 12-332 under the authority to award costs given it under A.R.S. section 25-324. Accordingly, we affirm the assessment of Dr. Joy's fees against Dodge.

### III.

¶ 55 During the trial court proceedings, the Gravilles sought awards of their attorneys' fees as sanctions under A.R.S. sections 12-349, 12-341.01(C), and Rule 11, Arizona Rules of Civil Procedure. They also sought an award of fees under A.R.S. section 25-324. The court denied their requests, finding:

[N]either Petitioner nor Respondent are in any more advantageous financial situation that would justify either being responsible for the other's attorney's [sic] fees and costs in this matter . . . . [and] while the issues on the merits as well as the pre-trial discovery issues were hotly contested by

the parties, neither party has acted in such an unreasonable fashion so as to justify an award of attorney's [sic] fees to either party.

The Gravilles cross-appealed from the court's denial of their request for an award of attorneys' fees.

 ¶ 56 A trial court's denial of attorneys' fees—whether requested as sanctions or under A.R.S. section 25–324—is reviewed under an abuse of discretion standard. *Reed v. Mitchell & Timbanard, P.C.*, 183 Ariz. 313, 320, 903 P.2d 621, 628 (App.1995); *Hrudka v. Hrudka*, 186 Ariz. 84, 94–95, 919 P.2d 179, 189–90 (App.1995). The trial court observed the conduct of the parties in the action, had the financial records of the parties before it, and explained its reasons for declining to award attorneys' fees to either party. The Gravilles have shown no compelling reason for us to find that the trial court abused its discretion in denying fees to both sides. Therefore, we affirm the denial of fees.

## IV.

¶ 57 Both the Gravilles and Dodge request an award of their attorneys' fees incurred on appeal under A.R.S. section 25–324. Such an award may be made after considering the financial resources of both parties and the reasonableness of the positions they have taken throughout the proceedings. Based on financial statements from 1997, the parties have similar financial resources. Dodge's constitutional challenge to the grandparent visitation statute and the Gravilles' defense of the statute were reasonable, particularly because this is a question of first impression in Arizona. Therefore, we deny both parties' requests for an award of attorneys' fees. Because the Gravilles are the prevailing parties they are entitled to an award of their costs incurred on appeal upon the filing of a statement of costs.

¶ 58 Dodge also requests an award of attorneys' fees under A.R.S. sections 12–341.01(C) and 12–349. Because we have decided this appeal in favor of the Gravilles, we find their defense of this appeal was not frivolous or done in bad faith. Accordingly, we deny Dodge's request.

## V.

¶ 59 We affirm the judgment of the trial court but modify its order to strike those portions directing Dodge to encourage his daughters to telephone the Gravilles on a weekly basis, to consider the Gravilles as alternative caregivers, and to refrain from discussing custody issues with his daughters.

CONCURRING: JAMES B. SULT, Presiding Judge, WILLIAM F. GARBARINO, Judge.