NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO J.P.

No. 1 CA-JV 24-0060

FILED 04-01-2025

---

Appeal from the Superior Court in Maricopa County
No. JD38311
The Honorable Joshua D. Rogers, Judge

**AFFIRMED**

---

COUNSEL

Maricopa County Legal Defender's Office, Phoenix
By Jamie R. Heller
*Counsel for Appellant Mother*

Czop Law Form PLLC, Higley
By Steven Czop
*Counsel for Appellant Father*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Appellee Department of Child Safety*

David W. Bell Attorney at Law, Higley
By David W. Bell
*Counsel for Appellee Child*

---

**MEMORANDUM DECISION**

Presiding Judge Michael S. Catlett delivered the decision of the Court, in which Judge Daniel J. Kiley and Judge David D. Weinzweig joined.

---

**C A T L E T T**, Judge:

**¶1**        Danielle B. (who identifies as male and goes by "Daniel") and Brendan P. ("Brendan") appeal the juvenile court's order terminating their parental rights as to J.P. ("Child"). Daniel argues there was insufficient evidence that he abandoned Child and the Department of Child Safety ("Department") did not provide adequate reunification services. Both Daniel and Brendan argue the juvenile court erred in concluding that termination is in Child's best interests. Because there was sufficient evidence supporting the court's findings and it properly conducted the best interests analysis, we affirm.

## FACTS AND PROCEDURAL HISTORY

**¶2**        Child was born in 2021. At birth, Child was substance exposed to THC and had a misshapen skull. The Department contacted Daniel and Brendan multiple times to verify they had scheduled necessary medical appointments for Child, but they had not done so. Brendan threatened violence against the Department and reported being diagnosed with schizophrenia and oppositional defiant disorder. During a meeting with a counselor, Daniel admitted to being under the influence of marijuana and stumbled when he went to pick up Child. Brendan was present at the time and made no effort to protect Child by stopping Daniel from picking her up while impaired. A few days later, Daniel stated that caring for Child was too difficult and that he no longer wanted to be involved. Daniel then moved to Tucson.

**¶3**        In August 2021, the Department petitioned the juvenile court to find Child dependent. When neither Daniel nor Brendan appeared for a hearing, the juvenile court found Child dependent as to both. The Department initially placed Child with a family friend. In January 2022, that kinship placement indicated she was no longer able to financially support and care for Child, so the Department moved Child to foster care.

¶4        A psychologist diagnosed Brendan with, among other things, cannabis dependence, unspecified mood disorder, and adjustment disorder.  Brendan was discharged from psychological services due to non-engagement, but he re-engaged nearly eleven months later.  Brendan completed parenting classes, and the Department documented an improvement in his parenting abilities.  While Brendan eventually increased his time spent with Child, the Department documented that he made suicidal comments and expressed a desire not to be around Child.  He also used violent imagery during visits—stating, for example, that he used marijuana earlier that day because he would "rather be dipped in a vat of acid than be awake right now."

¶5        Around March 2023, after approximately a year and a half without contacting Child, Daniel reached out to the Department from Tucson and resumed visitation.  But shortly thereafter, Daniel claimed health issues prevented him from traveling, so he asked the Department to bring Child to Tucson for visits.  The Department arranged visits in Tucson but observed that Daniel did not engage much with Child.  When Child's foster parent expressed concern about frequently traveling to Tucson with a toddler, the Department requested that Daniel obtain a doctor's note confirming his inability to travel.  Daniel failed to provide such a note and missed four visits in one month.

¶6        In July 2023, the Department petitioned to terminate Daniel and Brendan's parental rights.  At the termination hearing, Daniel admitted to moving to Tucson and being away from Child for approximately a year and a half.  He testified that, during that time, he was homeless and did not have a phone.  Daniel also testified that he began having seizures after a car accident, and he claimed he was still trying to obtain a doctor's note to have visitations in Tucson.

¶7        Brendan claimed he did not remember making suicidal comments.  He described other violent comments he made as "minor stupid, joking comments I make with my friends around me."  Brendan acknowledged that Child's foster parent texted him updates and photos.  But, when his phone broke, Brendan did not provide Child's foster parent with his new number because "[i]t kept slipping [his] mind."  Finally, Brendan preferred that Child be returned to the kinship placement rather than Child's foster parent.

¶8        The foster parent testified that Child calls her "mom" and that "she loves [her]" and "gives hugs and kisses."  The foster parent said she was willing to adopt Child.  A Department case manager recommended

3

against moving Child out of foster care and back to the kinship placement given Child's age and concerns about instability.

¶9        The juvenile court found multiple grounds for terminating both parents' rights.  For Daniel, the court found that he abandoned Child by moving to Tucson and not attempting to maintain a relationship with Child for approximately a year and a half.  For Brendan, the court terminated based on mental illness due to "continued lack of impulse control" and inappropriate statements he made to Child.  The court found termination was in Child's best interests because her foster placement intended to adopt her, which would give her stability and permanency.  The court acknowledged that the kinship placement was willing to take Child back, but determined that placement was not in Child's best interest because she was "very bonded" with the foster parent, who was willing to adopt her and with whom she "has thrived[.]"

¶10       Daniel and Brendan timely appealed.  We have jurisdiction. *See* A.R.S. § 8-235(A).

## DISCUSSION

### I.        Abandonment

¶11       Although Brendan challenges only the juvenile court's best interests finding, Daniel argues the evidence did not adequately support termination based on abandonment.  "Parents have a fundamental right to raise their children as they see fit, but that right is not without limitation." *Minh T. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 76, 79 ¶ 14 (App. 2001) (citing *Graville v. Dodge*, 195 Ariz. 119, 124 ¶ 20 (App. 1999)).  Before terminating a parent's rights, the juvenile court must find by clear and convincing evidence that at least one of the grounds in A.R.S. § 8-533(B) exists and must find by a preponderance of the evidence that termination is in the child's best interests. *Kent K. v. Bobby M.*, 210 Ariz. 279, 288 ¶ 41 (2005); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249 ¶ 12 (2000).  We will "affirm a termination order unless the juvenile court abuses its discretion or the court's findings are not supported by reasonable evidence." *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 474 ¶ 14 (2022) (citation omitted).  We will accept the juvenile court's factual findings if supported by reasonable evidence and inferences. *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478 ¶ 30 (2023) (citation omitted).  We will not disturb the juvenile court's conclusions for insufficient evidence unless no one could reasonably find the evidence to be sufficient. *Id.* at 479 ¶ 31 (citation omitted).

**¶12** One ground for terminating a parent's rights is abandonment. A.R.S. § 8-533(B)(1). Abandonment occurs when a parent fails to "provide reasonable support and to maintain regular contact with the child," making "only minimal efforts to support and communicate with the child." A.R.S. § 8-531(1). Failing "to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment." A.R.S. § 8-531(1).

**¶13** In challenging abandonment, Daniel primarily emphasizes certain steps he took to care for Child—attending court hearings and contacting the Department a couple times. Daniel's examples are insufficient to avoid abandonment. *See Michael J.*, 196 Ariz. at 249 ¶ 18 ("[A]bandonment is measured not by a parent's subjective intent, but by the parent's conduct[.]"). Daniel did not dispute that he had no contact with Child for a year and a half—three times longer than the six months needed for a prima facie showing of abandonment. *See* A.R.S. § 8-531(1). Although Daniel briefly resumed visits with Child before the Department moved for termination, the visits ceased after only a couple months, and he did not provide a doctor's note supporting that he could not travel from Tucson. Daniel does not argue or suggest that he provided "reasonable support" or made "regular contact" with Child. *See* A.R.S. § 8-531(1). The record contains sufficient evidence that Daniel did not provide reasonable support or maintain regular contact with Child for more than six months, which constitutes abandonment under Arizona law. *See* A.R.S. § 8-531(1); *Brionna J.*, 255 Ariz. at 478–79 ¶¶ 30–31.

**¶14** Daniel also argues that the Department did not provide sufficient reunification services. But reunification services are not required before finding abandonment, so we need not address Daniel's argument. *See Bobby G. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 506, 510 ¶ 11 (App. 2008) ("[N]either § 8-533 nor federal law requires that a parent be provided reunification services before the court may terminate the parent's rights on ground of abandonment."); *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 376–77 ¶ 14 (App. 2010).

## II.    Best Interests

**¶15** Both Daniel and Brendan argue that the court erred by not considering the totality of circumstances when making its best interests finding. In pressing their arguments, Daniel and Brendan focus primarily on their own interests, not Child's. Brendan argues that "[t]he best interest analysis must go beyond focusing only on [Child's] interest." At most,

Daniel and Brandon argue that there is some evidence that does not support the court's best interests finding.

**¶16** Once a parent is found unfit, "the interests of the parent and child diverge because the court has already found the existence of one of the statutory grounds for termination by clear and convincing evidence." *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4 ¶ 15 (2016) (internal quotation marks omitted) (quoting *Kent K.*, 210 Ariz. at 286 ¶ 35). At the best interests stage, "it is a given that the child's best interests predominate." *Timothy B.*, 252 Ariz. at 478 ¶ 31. For best interests, "[t]he juvenile court should consider [a parent's] past and ongoing efforts to parent . . . and the impact of those effort's on [Child's] best interest in a safe and stable home life[.]" *Id.* Termination is in a child's best interests if the Department proves by a preponderance of the evidence that (1) the child will benefit from termination, or (2) the child will be harmed without termination. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150 ¶ 13 (2018); *Kent K.*, 210 Ariz. at 288 ¶ 41. The juvenile court must consider the totality of circumstances at the time of termination. *Alma S.*, at 150–51 ¶ 13.

**¶17** The record contains sufficient evidence that termination is in Child's best interests. The court heard testimony that Daniel had little or no contact with Child for approximately a year and a half, he was not engaged when visitations resumed, and he did not provide a doctor's note to justify transporting Child to Tucson for visits. The court heard testimony that Brendan did not provide Child's foster parent his new phone number because "[i]t kept slipping [his] mind." Daniel and Brendan's past and ongoing efforts to parent Child do not establish that the court erred in finding that termination is in Child's best interests. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282 ¶ 12 (App. 2002) ("[W]e do not re-weigh the evidence on review.").

**¶18** The court also heard testimony that Child calls foster parent "mom," tells her "she loves her," and gives her "hugs and kisses." The foster parent also testified she was willing to adopt Child. "It is well established in state-initiated cases that the child's prospective adoption is a benefit that can support a best-interests finding." *Demetrius L.*, 239 Ariz at 4 ¶ 16 (citation omitted).

**¶19** The court also considered whether moving Child back to a kinship placement was in Child's best interests. The Department case manager testified that moving Child out of her foster parent's home was not in her best interests given Child's age and concerns about instability. The court acknowledged Child's former kinship placement was willing to

return to that role, but concluded that was not in Child's best interests because she was "very bonded" and "has thrived" with the foster parent, who was willing to adopt her. Finally, Child, through counsel, has stated to us that it is in her best interests to terminate her parents' rights. The juvenile court properly evaluated Child's best interests.

## CONCLUSION

¶20        We affirm the juvenile court's termination of Daniel and Brendan's parental rights as to Child.

