41 P.3d 614

**MINH T., and Tung T., Appellants,**

**v.**

**ARIZONA DEPARTMENT OF ECONOMIC SECURITY, Diane T., Stephanie T., Tommy T., and Taylor T., Appellees.**

**No. 1 CA–JV 01–0078.**

Court of Appeals of Arizona, Division 1, Department C.

Dec. 24, 2001.

Redesignated as Opinion and Publication Ordered March 6, 2002.

Janet Napolitano, Attorney General, By Felicita Torres, Assistant Attorney General, Phoenix, Attorneys for Appellee Arizona Department of Economic Security.

Robert S. Briney, Office of the Legal Defender, By Virginia Matte and Michael Westervelt, Phoenix, Attorneys for Appellant Mother.

Janelle McEachern and Joni N. Schill, Scottsdale, Attorneys for Appellant Father.

Office of the Legal Advocate, By William Owsley, Phoenix, Attorney for Appellee children.

Jeffrey Zurbriggen, Guardian ad litem, Tempe, for Appellee children.

## OPINION

RYAN, Judge.

¶ 1 This is a parent-child termination case. The father, Tung T., and the mother, Minh T., are accused of murdering one of their daughters. The Arizona Department of Economic Security ("ADES") petitioned to terminate Minh's and Tung's parental rights as to their other children. Because at one point the case plan was to reunify the family,

ADES offered family reunification services. Such services would have included involvement in counseling and psychological evaluations. The parents refused to participate because their criminal defense attorneys advised them that they might incriminate themselves. The trial court subsequently granted ADES's petition, finding that the parents' refusal to participate in family reunification services constituted a willful refusal to remedy the circumstances that caused the children to be in an out-of-home placement for nine months or more. *See* Ariz.Rev.Stat. ("A.R.S.") § 8–533(B)(7)(a) (Supp.2000).

¶ 2 The parents appeal, arguing that they had a constitutional right not to participate in reunification services because they were involved in ongoing criminal proceedings. We hold that the parents had *no* constitutional right to refuse to participate in reunification services because there was no evidence that such services would have required them to incriminate themselves. We therefore affirm.

### BACKGROUND

¶ 3 On May 14, 1999, at around 7:00 p.m., Minh called police and told them that her daughter, Christine, was not breathing. When the police arrived at the home, they found Christine dead, covered with bruises and lacerations. The family told the police that on the previous afternoon, Christine had come home from a walk at a construction site with bruises and other injuries. They said that Christine was babbling and could not explain what had happened to her. Minh and one of her daughters then bathed Christine and placed her in a "prayer room." Tung came home from work around 7:00 p.m. and they began to rub oil on Christine's body and pray for her.

¶ 4 Early the next morning, Tung got up for work and went to the "prayer room" to check on Christine. He found Christine cold and clammy, and she was not breathing. Tung attempted cardiopulmonary resuscitation on Christine but told police that he knew she was dead at that point. The family continued resuscitation efforts and also prayed for several hours, hoping that Christine would come back. The family finally called the police that evening after a relative convinced them to do so.

¶ 5 The police classified Christine's death as suspicious and the next day ADES' Child Protective Services ("CPS") division took the other three children into protective custody, citing the failure to seek medical attention and the delay in reporting Christine's death. On June 29th, Minh gave birth to a son, and CPS took him into custody immediately.

¶ 6 Because of the severity of Christine's injuries, Minh's and Tung's failure to seek any timely assistance, evidence of possible sexual abuse of two of the daughters, and that this was the family's seventh investigation by CPS, the original CPS plan was severance and adoption. However, when the case was transferred to another caseworker a few months later, the plan changed to family reunification. CPS offered Minh and Tung services such as counseling, psychological evaluations, parent aide services, including parenting skills and training, and domestic violence counseling.

¶ 7 Minh and Tung were eventually arrested and incarcerated in connection with Christine's death. CPS continued to offer Minh and Tung reunification services, including finding an Asian Buddhist psychologist to counsel Minh and Tung in jail and assigning them a parent aide. Both Minh and Tung initially agreed to participate in the services; however, they later decided not to participate upon the advice of their criminal defense attorneys. CPS informed Minh and Tung their participation in these services was extremely important to the family reunification plan, and that they would not be reunited with their children if they did not participate. But the parents refused, citing their attorneys' advice.

¶ 8 In April 2001 the juvenile court ordered the termination of the parent-child relationship between Minh and Tung and their four children. Minh appeals the severance as to all four children, and Tung appeals the severance as to the two daughters.

### DISCUSSION

¶ 9 "We will not disturb the juvenile court's order severing parental rights

unless its factual findings are clearly erroneous, that is, unless there is no reasonable evidence to support them." *Audra T. v. Ariz. Dep't. Econ. Sec.*, 194 Ariz. 376, 377, ¶ 2, 982 P.2d 1290, 1291 (App.1998). "To accomplish a severance of parental rights, the State must establish each of the requisite elements by clear and convincing evidence." *Mary Ellen C. v. Ariz. Dep't. Econ. Sec.*, 193 Ariz. 185, 190, ¶ 25, 971 P.2d 1046, 1051 (App.1999) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). The trial court must find "at least one of the statutory grounds set out in section 8–533, and also that termination is in the best interest of the child." *Michael J. v. Ariz. Dep't. Econ. Sec.*, 196 Ariz. 246, 247, ¶ 12, 995 P.2d 682, 685 (2000).

¶ 10 Under A.R.S. § 8–533(B)(7)(a), a court is authorized to terminate a parent-child relationship if "the agency responsible for the care of the child has made a diligent effort to provide appropriate reunification services" and the "child has been in an out-of-home placement for a cumulative total period of nine months or longer" and "the parent has substantially neglected or wilfully refused to remedy the circumstances which cause the child to be in an out-of-home placement."

¶ 11 The juvenile court found that the children had been cared for in an out-of-home placement under a court order for more than nine months. The court also found that ADES had made a diligent effort to provide appropriate reunification services, but the parents wilfully refused to remedy the circumstances that caused the children to be in an out-of-home placement. Finally, the court found that all four children are adoptable, and that termination of the parent-child relationship to permit adoption would be in the children's best interests. Therefore, it ordered termination of the parent-child relationships.

¶ 12 Minh and Tung argue that the trial court erred in severing their parental rights because their refusal to participate in agency services was based on their Fifth Amendment right to be free from compelled self-incrimination. They claim that they were willing to participate in reunification services offered by CPS. But because the nature of the services might have lead them to make incriminating statements, they were advised against it. Both argue that they faced an irreconcilable dilemma—either participate in CPS services and risk incriminating themselves, which would lead to a criminal conviction and the loss of custody of their children, or invoke their Fifth Amendment rights and refuse to participate, which would also lead to the severance of their parental rights. As a result, they contend that they were forced to choose one constitutional right over another.

¶ 13 The Fifth Amendment privilege against compulsory self-incrimination " 'can be claimed in any proceeding, be it criminal or civil, administrative or judicial, investigatory or adjudicatory. [I]t protects any disclosures which could be used in the criminal prosecution or which could lead to other evidence that might be so used.' " *In re Gault*, 387 U.S. 1, 47–48, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (quoting Justice White, concurring in *Murphy v. Waterfront Comm'n.*, 378 U.S. 52, 94, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964) (citations omitted)). The privilege may be invoked when there is a reasonable danger of incrimination. *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). "Furthermore, the privilege is self-executing, that is, it does not have to be expressly raised, in cases where 'the individual is deprived of his "free choice to admit, to deny, or refuse to answer." ' " *In re Amanda W.*, 124 Ohio App.3d 136, 705 N.E.2d 724, 726 (1997) (quoting *Mace v. Amestoy*, 765 F.Supp. 847, 850 (D.Vt.1991)(quoting *Garner v. United States*, 424 U.S. 648, 657, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976)). Accordingly, the State cannot, "expressly or by implication," impose "a penalty for the exercise of the privilege." *Id.*

¶ 14 Parents have a fundamental right to raise their children as they see fit, but that right is not without limitation. *Graville v. Dodge*, 195 Ariz. 119, 124, ¶ 20, 985 P.2d 604, 609 (App.1999). The State has a right to protect children from abusive parents. *See id.* And to protect children from abusive parents, the State may require therapy and counseling for the parents. *See, e.g., In re Welfare of J.W. and A.W.*, 415 N.W.2d

879, 883 (Minn.1987) (holding that the State may compel abusive or neglectful parents to undergo treatment).

¶ 15 However, there is a distinction between a treatment order that requires parents to admit criminal misconduct and one that merely orders participation in family reunification services. *See id.* ("While the state may not compel therapy treatment that would require appellants to incriminate themselves, it may require the parents to otherwise undergo treatment."); *In re J.A.*, 166 Vt. 625, 699 A.2d 30, 31 (1997) ("trial court cannot specifically require the parents to admit criminal misconduct in order to reunite the family" but can require "extensive therapy and counseling"). Nevertheless, Minh and Tung argue that forcing them to participate in reunification services placed them at an unacceptable risk of incriminating themselves.

¶ 16 But merely requiring Minh and Tung to participate in reunification services did not necessarily mean that they would have had to incriminate themselves. That Minh and Tung faced difficult choices in complying with this requirement "is a consequence of their actions, and the difficulty is not removed by the Fifth Amendment." *In re M.C.P.*, 153 Vt. 275, 571 A.2d, 627, 641 (1989) (citing *J.W.*, 415 N.W.2d at 884). While CPS did notify them of the importance of the family reunification services and that their participation was necessary to reunite them with their children, Minh and Tung do not point to any order that required them to admit any criminal acts as part of the CPS case plan. Therefore, their Fifth Amendment rights were not violated. *See id.*

¶ 17 We therefore conclude that the juvenile court's factual findings were not clearly erroneous and that the court did not err in severing Minh's and Tung's relationships with their four children.

CONCURRING: SUSAN A. EHRLICH, Presiding Judge, and REBECCA WHITE BERCH, Judge.