NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

ROSABELLE P., ARTEM D., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, Y.D., Y.D., *Appellees*.

Nos. 1 CA-JV 14-0271, 1 CA-JV 14-0272 (Consolidated)
FILED 07-21-2015

---

Appeal from the Superior Court in Maricopa County
Nos. JS507490, JD510937
The Honorable Brian K. Ishikawa, Judge (Retired)

**AFFIRMED**

---

COUNSEL

Jeffrey M. Zurbriggen, P.C., Phoenix
By Jeffrey M. Zurbriggen
*Counsel for Appellant Rosabelle P.*

The Stavris Law Firm, PLLC, Scottsdale
By Christopher Stavris
*Counsel for Appellant Artem D.*

Arizona Attorney General's Office, Mesa
By Eric Knobloch
*Counsel for Appellee Department of Child Safety*

Maricopa County Office of the Legal Advocate, Phoenix
By Linda Ann Christian
*Counsel for Appellees Y.D. and Y.D.*

---

## MEMORANDUM DECISION

Presiding Judge Patricia K. Norris delivered the decision of the Court, in which Judge Patricia A. Orozco and Judge Maurice Portley joined.

---

**N O R I S**, Judge:

**¶1** Rosabelle P. ("Mother") and Artem D. ("Father") separately appeal from orders entered by the juvenile court adjudicating their children Y.D. ("infant") and Y.D. ("toddler") dependent, and terminating their parental rights. *See generally*, Ariz. Rev. Stat. ("A.R.S.") §§ 8-844 (2014), 8-533(B)(2) (Supp. 2014).[1] For the following reasons, we affirm the juvenile court's orders.[2]

---

[1]Although the Arizona Legislature amended certain statutes cited in this decision after the Department of Child Safety removed the children from the home, the amendments are immaterial to the resolution of this appeal. Thus, we cite to the current version of these statutes.

[2]Because the basis for the juvenile court's termination of Mother's and Father's parental rights was the same for finding the children dependent, and because we are affirming the juvenile court's termination order, the dependency appeal is moot. And, even if not moot, the evidence presented amply supported the juvenile court's dependency order, which relied on the same evidence as its termination order.

**FACTS AND PROCEDURAL BACKGROUND**

**¶2**        On March 23, 2013, one month after his birth, Mother called 911 after Father noticed swelling and a "crackle" in infant's leg. Paramedics responded, examined infant, and found nothing abnormal. The paramedics offered to transport infant to the hospital for x-rays but Mother and Father refused their offer. The following day, after Mother and Father noticed the swelling on infant's leg was worse, they took him to the hospital. Hospital staff x-rayed infant and diagnosed him with multiple fractures to his left and right legs. Hospital staff also noticed a facial bruise and contacted authorities to investigate suspected child abuse. A child abuse pediatrician diagnosed infant's injuries as "non-accidental trauma."

**¶3**        On March 28, 2013, the Department of Child Safety ("DCS") filed a dependency petition and on April 25, 2013 petitioned to terminate Mother's and Father's parental rights to the children. The juvenile court conducted a six-day hearing on both petitions. It found the children dependent and terminated Mother's and Father's parental rights pursuant to A.R.S. § 8-533(B)(2), finding they had "willfully abused a child or failed to protect a child from willful abuse so as to cause a substantial risk of harm to the child's health or welfare."

**DISCUSSION**

I.        Sufficiency of the Evidence: Child Abuse

**¶4**        Mother and Father first argue DCS failed to present sufficient evidence to terminate their parental rights under A.R.S. § 8-533(B)(2). We disagree. To terminate parental rights based on willful abuse under § 8-533(B)(2), DCS was required to prove by clear and convincing evidence that Mother and Father "willfully abused a child." *See* Ariz. R.P. Juv. Ct. 66(C). Willful abuse includes serious physical injury or "situations in which the parent knew or reasonably should have known that a person was abusing . . . a child." A.R.S. § 8-533(B)(2).

**¶5**        Absent an abuse of discretion, this court will affirm the juvenile court's termination order. *E.R. v. Dep't of Child Safety*, 237 Ariz. 56, __, ¶ 9, 344 P.3d 842, 844 (App. 2015). As the trier of fact, the juvenile court is best positioned to observe the witnesses, assess credibility, and weigh the evidence. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18, 219 P.3d 296, 303 (App. 2009). "Accordingly, we view the evidence and reasonable inferences to be drawn from it in the light most favorable to sustaining the court's decision . . . and . . . we will affirm a termination order unless we must say as a matter of law that no one could reasonably find the evidence

supporting statutory grounds for termination to be clear and convincing." *Id.* (citations omitted) (internal quotation marks omitted).

¶6        Here, DCS presented reasonable evidence supporting the juvenile court's finding infant had been abused.  During the hearing, Dr. Q—a child abuse pediatrician who had examined infant the day after his hospital admission—testified extensively about her conclusion infant's injuries resulted from "non-accidental trauma."  She testified that at first, only three of infant's four fractures were detected, but subsequent imaging revealed the fourth.  She stated the "most likely" explanation for the missed fracture was the fractures occurred at—and so began healing at—different times.  She also explained more recent fractures do not appear in x-rays until they begin to heal.

¶7        Dr. Q testified infant's fractures occurred because a "significant force [was] applied" and could have been caused by forcefully shaking, pulling, turning, or twisting his foot, or a "shearing motion."  The spiral fracture on infant's left leg should have caused "significant pain and swelling for the first few days" because of the location and size of the fracture, whereas the remaining fractures on infant's legs were more subtle, and outward symptoms might not have been noticed.  Based on the x-rays, however, Dr. Q opined that all the fractures occurred within seven to 10 days of March 24, 2013, when the x-rays were taken[3] ("abuse period").

¶8        Parents' expert, Dr. E, agreed with Dr. Q that it would take a "fairly significant" force such as a "rapid twist" or "shaking a limb" to cause infant's fractures and also agreed the fractures could have happened at different times.

¶9        Despite Dr. Q's testimony that infant's facial bruise was an injury caused by "blunt force trauma," Mother testified infant's bruise was caused by falling asleep on his pacifier.  Mother and Father also suggested that a bone disorder contributed to infant's fractures.  Medical testing, however, revealed no metabolic or genetic bone disorders.

¶10       Dr. Q also testified infant could not have sustained the injuries on his own because he was less than 30 days old and therefore non-

_____

[3]Parents' expert, Dr. E, initially agreed with Dr. Q that infant's fractures would have had to occur within 10 days of the x-rays.  He later testified, however, that generally pediatric bones begin calcifying within 10 to 12 days after fracturing and suggested the fractures could have been up to 14 days old.

ambulatory when the injuries occurred. She similarly testified toddler, who was approximately 18 months old when infant was injured, was not strong enough to cause infant's injuries. After reviewing all the records, Dr. E agreed with Dr. Q that child abuse "would be [the] most common cause" of infant's injuries.

¶11        Based on the foregoing, DCS presented reasonable evidence supporting the juvenile court's finding that infant had been willfully abused. DCS also presented reasonable evidence supporting the juvenile court's finding that, while infant was in the care of Mother and Father, they had willfully abused him or "knew or reasonably should have known that such abuse against the child was occurring due to the extent, mechanics, timing and circumstances of the child's injuries."

¶12        From the beginning of DCS's investigation through the hearing, Mother and Father consistently denied any responsibility for causing infant's injuries and disclaimed any first-hand knowledge of how he had been injured or who had injured him. Instead, they suggested that other people could have caused infant's injuries. For example, the day after taking infant to the hospital, Mother and Father told hospital staff the rabbi who conducted infant's circumcision, the pediatrician at his newborn checkup, or the hospital staff who drew blood and performed x-rays may have injured infant.

¶13        With the exception of hospital staff, however, these individuals did not have contact with infant during the abuse period. *See supra* ¶ 7. And, the hospital staff could not have injured infant's leg because his leg began to swell before Mother and Father brought him to the hospital. Indeed, during the 911 call, Mother stated, "My husband's telling me that he hears a crackle in my son's . . . leg and . . . his ankle is a little more swollen" than the other. She went on to say, "I mean, cause the thing is that he wouldn't fall asleep if he has, you know, a broken leg or something, right?" Dr. Q additionally testified she had never seen a single fracture result from a blood draw or x-ray, let alone four separate fractures, making the allegations against hospital staff implausible.[4]

---

[4]During the hearing, Mother conceded the rabbi could not have broken infant's legs because the circumcision "would not fit within the time frame of the fractures." She also acknowledged infant did not have a bone disorder.

¶14 DCS case manager K.H. testified it was important for DCS to receive "accurate information" regarding infant's injuries so it could "assist the parents in correcting the situation." Yet Mother and Father did not provide DCS with a list of people who had contact with infant until, at the earliest, February 2014—more than 10 months after DCS filed its dependency petition.[5] During the hearing, Mother named 16 individuals who were "around" infant before his hospitalization, and said there were several others "from the community" who came to her home. Nevertheless, despite the severity of infant's injuries, Mother never provided any of these names to the police, claiming they "never asked."

¶15 Further, Mother made conflicting statements regarding whether others had taken care of the children within the abuse period. At first, she told a police detective that no one had helped her take care of the children. Specifically, during an interview conducted two weeks after DCS had removed the children, the detective asked Mother, "Who else is helping take care of the kids? Anybody else?" to which Mother replied, "No." The detective then clarified, "So you have nobody else that's helping take care of your kids?" and Mother replied, "It's just me and my husband." In contrast to her statements to the detective, however, during the hearing, Mother, who cared for both children while Father worked, testified her father and brother would "frequently" babysit "for an hour, two hours, sometimes three."[6]

¶16 As the foregoing reflects, Mother testified inconsistently regarding who could have abused infant. Under the version Mother told to police, only she and Father had care, custody, and control of infant. As Dr. Q testified, there was no possibility infant sustained these injuries on his own. Infant had no bone disorders, and a "significant force" was required to cause the fractures. Under the version Mother and Father principally presented at the hearing, *see supra* ¶¶ 14-15, other individuals could have caused infant's injuries. Mother, however, only testified generally about these other individuals; with one exception, *see supra* ¶ 15

[5]K.H. testified she did not recall receiving a list of names of individuals who had contact with infant until approximately two to three weeks before the hearing.

[6]Mother testified a lot of "people from the community" had contact with infant during the abuse period, and she described one incident involving a family friend on March 23, 2013—the day Mother called 911. Based on Dr. Q's testimony, however, that incident could not fully explain infant's injuries. *See supra* ¶¶ 6-7.

n.6, she provided no evidence these other individuals did anything to harm infant.

¶17         Although the juvenile court did not explicitly state which version of events it accepted, it implicitly rejected the version Mother and Father presented at trial, finding they had been unable to provide an "adequate explanation" for infant's injuries, and either willfully abused infant or "knew or reasonably should have known" infant was being abused because of the "extent," (infant suffered multiple fractures, possibly at different times, and bruising) "mechanics," (a significant force caused infant's fractures) "timing," (the fractures occurred within the abuse period) and "circumstances" of infant's injuries (Mother's original statement to police that only she and Father had cared for infant).  The court did not abuse its discretion in making these findings and in terminating Mother's and Father's parental rights under A.R.S. § 8-533(B)(2).

II.     Best Interests

¶18         Mother and Father next argue DCS failed to prove termination was in the children's best interests.  A juvenile court must find, by a preponderance of the evidence, *Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 42, 110 P.3d 1013, 1022 (2008), that termination of parental rights is in the child's best interests; specifically, how the child "would benefit from a severance *or* be harmed by the continuation of the relationship." *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5, 804 P.2d 730, 734 (App. 1990); *see also* A.R.S. § 8-533(B) (juvenile court shall consider best interests in addition to statutory termination ground).  We review a best interests decision for an abuse of discretion, *see supra* ¶ 5, and will not reverse the juvenile court's decision if there is reasonable evidence to support it. *Jordan C.*, 223 Ariz. at 93, ¶ 18, 219 P.3d at 303.  The juvenile court found DCS had shown by a preponderance of the evidence that termination was in the children's best interests because "continuation in the care, custody and control of parents" would have exposed the children to abuse and because the children were "adoptable."

¶19         DCS presented reasonable evidence supporting the juvenile court's findings.  First, as the DCS case manager K.H. essentially testified, given the unexplained abuse suffered by infant while in the care of Mother and Father, the children were at risk of abuse if left in their continued care.  And, as she explained, DCS had been unable to "identify" the parents as safe and appropriate.  Second, based on K.H.'s testimony, the court found termination would provide the children with "permanence and stability" because their paternal grandmother was "willing to adopt them and [could]

provide the children with all of their physical, emotional, educational, medical and social needs."

## III.     Termination of Mother's Parental Rights to Toddler

**¶20**        Mother separately argues the juvenile court made no factual findings regarding toddler, and, relatedly, DCS failed to present any evidence to support terminating her parental rights to toddler. We disagree with both arguments.

**¶21**        The juvenile court terminated Mother's and Father's parental rights to toddler based on willful abuse of *a* child. *See* A.R.S. § 8-533(B)(2). In *Mario G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 282, 285, ¶¶ 15-16, 257 P.3d 1162, 1165 (App. 2011), this court held a juvenile court may terminate parental rights to a child who has not been abused when DCS proves a sufficient nexus between the past child abuse and the potential for future abuse. One child's unexplained injuries may be a sufficient nexus for terminating parental rights to a different child, especially when the parents know or reasonably should have known the cause of the injuries. *Id*. at 288, ¶ 25, 257 P.3d at 1168.

**¶22**        Here, as in *Mario G.*, the juvenile court found Mother "knew or reasonably should have known" infant was being abused. Like the parents in *Mario G.*, Mother and Father were unable to provide a plausible explanation for infant's injuries, and DCS could not rule out either parent as the perpetrator of the abuse against infant.

**¶23**        During the hearing, Mother conceded infant's injuries had been caused by abuse, however she continued to assert that she and Father had kept infant "safe" despite his injuries. Given the numerous, implausible suggestions offered by Mother and Father as to how infant sustained the fractures and bruising, *see supra* ¶¶ 9, 12-14, the juvenile court concluded a nexus existed between infant and toddler because "parents [were] so entrenched in denying responsibility for the abuse, it would [have] put both children at risk of future abuse by parents if returned to their care." Reasonable evidence supports this finding.

## IV.    Delay in Proceedings

**¶24**        Mother next argues the juvenile court failed to "address the extreme delays in the adjudication of the dependency and termination cases." As discussed, the juvenile court conducted the dependency adjudication hearing jointly with the termination adjudication hearing beginning on June 16, 2014—more than one year after DCS filed its

petitions. Arizona Rules of Procedure for the Juvenile Court 55(B) and 66(B) prescribe time limits for conducting dependency and termination adjudication hearings. These rules, however, authorize the juvenile court to continue dependency and termination adjudication hearings upon a written finding of extraordinary circumstances.

¶25 Although the hearing occurred outside of the time limits prescribed by Rules 55(B) and 66(B), the record reflects, first, that the juvenile court addressed the delays, second, in large part Mother and Father caused the delays, and third, the juvenile court did not abuse its discretion in granting the continuances. *See Kimberly D.-D. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 207, 208, ¶ 5, 320 P.3d 823, 824 (App. 2013) (juvenile court's decision to grant continuance reviewed for abuse of discretion).

¶26 On April 22, 2013, three days before DCS filed the termination petition, Father's counsel moved to withdraw and requested the juvenile court determine the appropriateness of Mother's counsel because Mother's attorney represented both Mother and Father in an ongoing criminal case and represented only Mother in the dependency proceeding. On May 22, 2013, the juvenile court relieved Father's counsel of further responsibility in the case, took the motion to determine appropriateness of counsel under advisement, and continued the hearing, finding extraordinary circumstances.

¶27 On October 9, 2013, Father, with Mother's agreement, moved to continue the hearing because disclosure was still in progress, Father had not yet undergone his psychological evaluation, and genetic testing needed to be scheduled. During an October status conference the juvenile court again found extraordinary circumstances and continued the hearing. During that same status conference Father's attorney advised the juvenile court of a potential conflict of interest due to his professional and personal relationship with the children's placement. At a November status conference the court addressed Father's counsel's conflict and found the conflict could not be waived and extraordinary circumstances warranted an additional continuance.

¶28 During a January 2014 status conference the court set the dates for the hearing beginning in June and made its final written finding of extraordinary circumstances. In its termination order, the juvenile court stated adjudication of the dependency and termination petitions was "protracted due to extraordinary circumstances including issues related to the change in attorneys, language needs/interpreters, discovery, witnesses, and scheduling."

**¶29** The record amply supports this statement. Accordingly, the juvenile court acted within its discretion in continuing the dependency and termination adjudication hearing.

## V. Mother's Fifth Amendment Rights

**¶30** Mother also argues she was "unable to assert her Fifth Amendment privilege in the initial stages of [the] dependency matter and was demanded by [DCS] to explain what happened to her child" and that she "was forced to either incriminate herself or come up with a reasonable explanation of what happened to her child." Putting aside Mother's failure to raise this issue in the juvenile court, the record does not support her arguments.

**¶31** First, Mother testified she "was not allowed to" speak about the case with DCS's investigating case manager and was told "we're not going to be talking about the case right now. We're going to be talking about a case plan" because of an open police investigation. DCS's initial court report dated March 29, 2013 also states, "Parents were not interviewed by [DCS] about the allegations in order to preserve the integrity of the open police investigation." Therefore, the record contradicts Mother's argument she was unable to assert her Fifth Amendment privilege in the initial stages of the dependency proceeding.

**¶32** Second, Mother was not compelled to testify during the hearing. This court has held that merely facing "difficult choices" does not necessarily implicate the Fifth Amendment. *Minh T. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 76, 80, ¶ 16, 41 P.3d 614, 618 (App. 2001). Mother decided to testify at the hearing, and any difficult choices she faced as to the content of her testimony was "a consequence of [her] actions." *Id.* Mother was also not required to "incriminate herself" during the hearing. Indeed, she did not do so. The testimony she gave was largely consistent with her earlier accounts to police and DCS. The juvenile court simply found her testimony not credible. We therefore reject Mother's arguments.

## VI. Participation in Services

**¶33** Mother next argues the juvenile court failed to consider her participation in services as a mitigating factor because it did not "mention" her participation in supervised visits and a psychological evaluation, and so it must not have considered her participation, "despite mandatory law to the contrary." *See* A.R.S. § 8-844(B) (2014) (court shall consider parent's efforts to obtain and participate in services). The juvenile court, however, explicitly stated it had "heard, considered and weighed all of the testimony

and . . . Exhibit 14 (Case Aide Notes [from supervised visitations]); Exhibit 15 (Case Aide Notes [from supervised visitations] dated 08-01-13 – 11-28-13); [and] Exhibit 16 (Psychological Evaluation for Mother . . .)." During the hearing, the psychologist who performed Mother's evaluation, case manager K.H., and Mother herself discussed Mother's participation in services. Mother's argument is, therefore, not supported by the record.

VII.     Definition of Abuse

¶34     Finally, Mother argues the juvenile court "improperly grafted the definition of abuse under A.R.S. §8-201 into the definition of abuse under A.R.S. §8-533(B)(2)." We reject this argument.

¶35     Mother's argument assumes that because the juvenile court cited A.R.S. § 8-201(2) (Supp. 2014) in its termination order, it necessarily found abuse under a "more easily met standard." Quoting A.R.S. § 8-533(B)(2), however, the juvenile court found Mother had "willfully abused a child" or failed to protect a child from willful abuse; infant sustained "serious physical" injuries; and Mother "knew or reasonably should have known" that such abuse against the child was occurring. Thus, the juvenile court terminated Mother's parental rights pursuant to the governing statute.

**CONCLUSION**

¶36     For the foregoing reasons, we affirm the juvenile court's orders adjudicating infant and toddler dependent as to Mother and Father, and terminating their parental rights to the children.



Ruth A. Willingham · Clerk of the Court
FILED: RT