NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

SHUKURA J., X'ZAVIER F., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, N.F., X.F., H.F., *Appellees*.

No. 1 CA-JV 21-0241
FILED 3-8-2022

Appeal from the Superior Court in Maricopa County
No.  JD35946
The Honorable Todd F. Lang, Judge

**AFFIRMED**

COUNSEL

John L. Popilek PC, Scottsdale
By John L. Popilek
*Counsel for Appellant Shukura J.*

David W. Bell Attorney at Law, Higley
By David W. Bell
*Counsel for Appellant X'Zavier F.*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Appellee*

---

**MEMORANDUM DECISION**

Judge Angela K. Paton delivered the decision of the Court, in which Presiding Judge Jennifer B. Campbell and Judge Samuel A. Thumma joined.

---

**P A T O N**, Judge:

¶1        Shukura J. ("Mother") and X'Zavier F. ("Father") appeal the superior court's order terminating their parental rights to their three children. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2        Mother and Father are the biological parents ("Parents") of N.F., X.F., and H.F. N.F. was born substance-exposed to marijuana in 2014. DCS offered Mother drug testing and treatment services but did not take N.F. into its custody at that time. In February 2018, DCS received a report that Parents and three-year-old N.F. were homeless and staying in "shelters, motels and parks." DCS, however, was unable to locate the family.

¶3        When X.F. was born substance-exposed to marijuana in June 2018, DCS obtained an order taking physical custody of the children. DCS also filed a dependency petition, and although Parents initially contested the dependency, the children were found dependent as to Mother in March 2019 when she did not contest the issue, and as to Father in April 2019 when he failed to attend a court hearing without good cause shown.

¶4        On DCS's motion in early October 2018, the children were placed back in the physical custody of Parents. In June 2019, however, the children were again removed from Parents' physical custody when an unannounced DCS house visit revealed that Parents were not meeting the children's basic needs. Parents had no formula or food in the house and the children did not have adequate beds to sleep in. The caseworker was concerned with X.F.'s physical health. A pediatrician noted X.F. was malnourished and N.F. had a slight heart murmur.

¶5        Meanwhile, N.F. was observed displaying sexualized behaviors. Her first placement reported the behaviors almost immediately based on observations of her playing with dolls. Subsequent placements

reported similar behaviors. Reports later revealed that, while in Parents' care, N.F. was allowed to watch them have sex and watch pornography. At trial, DCS's psychologist testified that N.F.'s behaviors were indicative of someone who had been exposed to inappropriate sexual content. During the dependency, N.F. was in a total of nine in-home placements and ultimately placed in a group home.

¶6 While the dependency was pending, H.F. was born in July 2020. During the pregnancy, Mother tested positive for alcohol and marijuana. As a result, the superior court granted DCS's petition for legal custody of H.F. in July 2020, when H.F. was only eight days old. DCS filed a supplemental dependency petition as to H.F., who was found dependent in September 2020, when Father failed to appear without good cause shown and Mother did not contest the allegations of substance abuse and an ongoing inability to meet H.F.'s needs.

¶7 DCS provided various reunification services to Parents and the children. A psychologist evaluated Father in August 2020. Although the evaluation was incomplete given COVID-19 protocols, the psychologist reported that "his second- to third-grade level reading comprehension and poor judgment raise[d] concerns regarding his cognitive functioning." The psychologist added, however, that it was "unlikely [Father's] cognitive deficits rise to the level of an Intellectual Disability and likely fall into Borderline Intellectual Functioning as [Father] does not appear to have a significant enough deficit in cognitive ability or adaptive functioning to meet criteria for an Intellectual Disability." She noted that although she did not believe Father had an Intellectual Disability, he should receive services as if he had a cognitive impairment "to ensure he will be able to learn and implement the information/skills taught." The psychologist noted that "if intellectual deficits remain a concern," Father "should be sent back to this evaluator for IQ testing once" COVID-19 pandemic restrictions subsided.

¶8 At a December 2020 hearing, the court granted DCS's request to change the case plan for N.F. and X.F. to severance and adoption. As relevant here, DCS's motion to terminate, filed later that month, alleged the fifteen-month out-of-home-placement ground as to both Parents. *See* A.R.S. § 8-533(B)(8)(c). In April 2021, the court granted DCS's request to change the case plan for H.F. to severance and adoption. DCS's motion to

terminate, filed later in April 2021, alleged the six-month out-of-home placement ground as to both Parents. [1]  *See id.* § 8-533(B)(8)(b).

**¶9**        The three-day severance trial took place in late May and early June 2021.  By the time trial began, the older children had been in out-of-home placement for nearly two years and H.F. had been in out-of-home placement for nearly a year, since he was a newborn.  Approximately one month before the severance trial, Parents moved to Chicago, Illinois.

**¶10**        The superior court terminated Parents' parental rights as to N.F. and X.F. pursuant to the fifteen-month out-of-home placement ground and as to H.F. pursuant to the six-month out-of-home placement ground, also finding that termination was in the best interests of the children. Parents timely appeal from those rulings.  We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 8-235(A), 12-120.21(A)(1), and -2101(A)(1).

## DISCUSSION

**I.        The superior court did not abuse its discretion in terminating Parents' parental rights pursuant to the statutory grounds.**

**¶11**        Parents contend reasonable evidence did not support the superior court's decision to terminate their parental rights as to their children.  Parents, however, have shown no error.

**¶12**        Parents' rights to raise their children as they see fit is fundamental, but not absolute. *Minh T. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 76, 79, ¶ 14 (App. 2001) (citation omitted).  To terminate parental rights, the court must find (1) by clear and convincing evidence one of the statutory grounds under A.R.S. § 8-533(B) and (2) by a preponderance of the evidence that termination is in the best interests of the child. *See Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 12 (2000).  "The [superior] court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002) (citation omitted).  As such, if the court's factual findings

---

[1] Although DCS' motions also relied on A.R.S. § 8-533(B)(3) (mental health) as to Father for all three children, after DCS rested, Father moved for judgment as a matter of law on that ground, and DCS later withdrew that allegation.  Accordingly, that allegation is not at issue on appeal.

are supported by reasonable evidence, we will affirm its termination order unless such findings are clearly erroneous. *Minh T.*, 202 Ariz. at 78-79, ¶ 9 (citation omitted).

**¶13**      As discussed above, the superior court terminated Parents' parental rights as to N.F. and X.F. pursuant to the fifteen-month out-of-home placement ground and as to H.F. pursuant to the six-month out-of-home placement ground.  Under the fifteen-month ground, DCS must prove that the children have been in an out-of-home placement for fifteen months or longer, parents have been unable to remedy the circumstances causing the out-of-home placement, and there is a substantial likelihood that parents will not be able to exercise proper and effective parental control in the near future.  A.R.S. § 8-533(B)(8)(c).  Under the six-month ground, DCS must prove that the child who is under three years old has been in an out-of-home placement for a cumulative period of six months or longer, and that parents "substantially neglected or willfully refused to remedy the circumstances" that gave rise to the out-of-home placement, including "refusal to participate in reunification services offered by [DCS]."  *Id.* § 8-533(B)(8)(b).  Both grounds require DCS to make "a diligent effort to provide appropriate reunification services."  *Id.* § 8-533(B)(8).

**¶14**      Reasonable evidence supports the superior court's decision to terminate Parents' parental rights as to the older children, N.F. and X.F. They had been in out-of-home placement since June of 2019.  By the time of the severance trial in May 2021, the children had been in care for twenty-three months, far exceeding the fifteen months contemplated by statute.

**¶15**      The court also found that Parents failed to submit to consistent drug testing and continued to test positive for THC.  Father was non-compliant with testing and, for 520 days,  failed to call in to determine if he was required to engage in random drug testing.  Father missed seventy-five scheduled tests and tested positive for THC on two occasions. Parents lacked stable housing and finances throughout the proceedings.  At the time of trial in May 2021, Parents had not had in-person visits with X.F. and H.F. since December 2020.  Parents failed to complete individual counseling and attend most reunification team meetings, even though Mother acknowledged that "attendance would have enabled her to better understand [N.F.'s] behaviors and needs."  Mother successfully completed ten parenting classes but Father did not complete any.

**¶16**      Additionally, Parents failed to understand and accept N.F.'s sexualized behaviors.  The evidence indicated N.F. was shown pornography while living with Parents, that she watched Parents have sex,

and that her sexualized behaviors occurred immediately after being moved to out-of-home placement. Thus, the superior court properly concluded there was sufficient evidence that Parents were "unable to remedy the circumstances that cause the child to be in an out-of-home placement and there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." *See id.* § 8-533 (B)(8)(c).

**¶17** Reasonable evidence also supports the superior court's decision to terminate Parents' rights as to H.F. H.F. was taken into care as a newborn and had been in care since July 2020—for ten months at the time of the trial. Further, the record supports the court's finding that Parents substantially neglected or willfully refused to remedy the circumstances that caused out-of-home placement. As detailed above, Parents failed to participate in services when they lived in Arizona. One month before trial, they made the "stunning decision" to move to Chicago, rendering them unable to complete services or attend in person visits with their children. Father testified that he would not participate in services unless the court ordered him to, further demonstrating his "refusal to participate in reunification services offered by the department." *See id.* § 8-533 (B)(8)(b).

**¶18** Though Father failed to meaningfully engage in any of the services offered by DCS, he argues on appeal that the superior court erred in finding that DCS made "reasonable and diligent efforts to provide Father with appropriate reunification services." Specifically, Father argues that (1) DCS did not provide counseling as recommended by its expert psychologist, instead requiring Father to self-refer and (2) had the court ordered DCS to "actually provide the type of counseling indicated by [its psychologist], and had the court ordered Father to participate, he would have done so." DCS asserts that Father did not challenge the finding that DCS made diligent reunification efforts and therefore concedes this argument.

**¶19** Father had several opportunities before trial to object to the adequacy of services and failed to do so. The psychologist issued her psychological evaluation report on August 31, 2020. Father could have objected to DCS's failure to follow her recommendation at the dependency hearing on September 21, 2020. Instead, Father failed to appear at the hearing. Father had two subsequent opportunities to object to services at Report and Review hearings held in November and December of 2020 but again failed to appear at either hearing. Father also failed to include a sufficiency of services objection as part of his March 2021 Disclosure Statement. In April 2021, Father attended the pretrial conference and a final

pre-trial Report and Review hearing, and again failed to object to the services DCS provided. While we can treat his silence as waiver, we choose not to, and conclude instead that the record supports the court's finding.

**¶20** The trial evidence showed Father "essentially refused" the case manager's "[a]t least monthly" offers of assistance. The court found that "Father does not do services unless ordered by the court" and "repeatedly refused DCS' offers of assistance to implement the recommendations from the psychological evaluation in enrolling in an individual counselling program." Due to Father's failure to engage with the services DCS offered, we are unpersuaded by his argument that DCS failed to offer him sufficient reunification services. *See Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994) (citation omitted) (stating that DCS is "not required to provide every conceivable service or to ensure that a parent participates in each service it offers.").

## II. The record supports the court's finding that terminating Parents' parental rights was in the children's best interests.

**¶21** Parents also contend that the court erroneously found termination was in the children's best interests. When a court reaches the best-interests analysis, it presumes the parent and child's interests diverge because it has already found by clear and convincing evidence that a statutory ground for termination is present. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 12 (2018) (citation omitted). As such, "[o]nce a court determines that a parent is unfit, the focus shifts to the interests of the child as distinct from those of the parent." *Kent K.*, 210 Ariz. at 285, ¶ 31. If the child will benefit from terminating parental rights or if the child will suffer harm by continuing the relationship, then terminating parental rights is in the child's best interests. *Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 179, ¶ 20 (App. 2014) (citation omitted).

**¶22** Providing the child with stability and safety is a primary concern. *Alma S.*, 245 Ariz. at 150, ¶ 12 (citation omitted). Notably, however, courts should not disregard a parent's rehabilitation efforts when conducting the best-interests analysis but instead should consider the totality of circumstances in existence at the severance determination. *Id.* at 150-51, ¶¶ 13, 15 (citation omitted). "When a current placement meets the child's needs and the child's prospective adoption is otherwise legally possible and likely, a [superior] court may find that termination of parental rights, so as to permit adoption, is in the child's best interests." *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4, ¶ 12 (2016) (citation omitted).

¶23          The record includes ample evidence to support the superior court's best interests finding. The court reasoned that Parents made little effort toward reunification and lacked the requisite fitness to parent. *See A.R. v. Dep't of Child Safety*, 246 Ariz. 402, 407, ¶ 13 (App. 2019) (holding that in the context of a best interests analysis, it is within the superior court's discretion to consider all factors under a totality of the circumstances test, including evidence of Parents' reunification efforts, their fitness to parent, and the bond shared between parent and children) (citation omitted). The court found that X.F. and H.F. were adoptable, young, healthy, and bonded to their placements. *See Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 50, ¶ 19 (App. 2004) (citation omitted); *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 335, ¶ 8 (App. 2004) ("In combination, the existence of a statutory ground for severance and the immediate availability of a suitable adoptive placement for the children frequently are sufficient to support a severance order."). The trial testimony also indicated that N.F.'s group home placement would be more suitable than being with Parents, as she was "triggered" after visits with them. The superior court did not err in determining severance and adoption were in N.F.'s best interests.

## CONCLUSION

¶24          We affirm.



AMY M. WOOD • Clerk of the Court
FILED:   AA