NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

_____

IN RE TERMINATION OF PARENTAL RIGHTS AS TO B.W.

No. 1 CA-JV 23-0202
FILED 3-19-2024

_____

Appeal from the Superior Court in Maricopa County
No. JS520409
The Honorable Sigmund G. Popko, Judge *Pro Tempore*

**AFFIRMED**

_____

COUNSEL

Maricopa County Legal Defender's Office, Phoenix
By Jamie R. Heller
*Counsel for Appellant, Jason M.*

Barreda Law, PLLC, Gilbert
By Joshua A. Barreda, Bonnie Platter
*Counsel for Appellee*

---

**MEMORANDUM DECISION**

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge Samuel A. Thumma and Judge Michael J. Brown joined.

---

**C A M P B E L L**, Judge:

¶1 Father appeals the juvenile court's order terminating his parental rights based on abandonment and the child's best interests. *See* A.R.S. §§ 8-531(1), -533(B)(1). Because the court correctly applied the law and its order is factually supported by trial evidence, we affirm.

### BACKGROUND

¶2 Brian[1] was born to Mother and Father in early April 2015. Mother and Father had a longtime on-and-off relationship but were neither a couple nor living together at the time of Brian's birth.

¶3 For the first few months, Mother and Father took turns caring for Brian under an informal arrangement. By August 2015, Mother and Father were arguing about the parenting schedule and paternity. Then, on August 13, 2015, Father fatally shot his girlfriend's husband after he entered Father's house. The husband was talking on the phone with Mother when he was shot.

¶4 The state did not immediately bring charges. According to Father, he was alone at his house when the husband entered uninvited, wielding a knife. Mother told police that, on the phone, she heard Father and the husband exchange a greeting. She then heard a loud noise, followed by Father and a female talking about cleaning up blood.

¶5 In the months following the shooting, Father, who had not been arrested or charged with any crime, repeatedly asked Mother to see Brian and sent her a money order. But Mother refused. By at least January 2016, Father had stopped reaching out to Mother or Brian.

¶6 Father retained a criminal defense attorney in October 2015.[2] Father then directed Mother to communicate through his attorney only. For

---

[1]     We use a pseudonym for the child.
[2]     Father waived the attorney-client privilege at the termination trial.

the next six years, that attorney represented Father in connection with the shooting. In late 2016, Father's girlfriend was indicted for her husband's murder, and Father was indicted for evidence tampering. The State later dismissed that indictment and indicted both Father and his girlfriend for first-degree murder in early 2017 (and again in 2018). In November 2021, the case finally went to trial, where Mother testified for two days. At the conclusion of the trial, Father was acquitted.

¶7 During the course of Father's criminal representation, Father repeatedly told his attorney that he wanted to see Brian. The attorney, who believed that any contact with Brian necessarily would involve contact with Mother, consistently advised him not to have contact with Mother because it could compromise his criminal case. The attorney believed that any pre-indictment contact could be misconstrued as a threat or bribe, and that it would be futile to seek modification of orders prohibiting witness contact. According to Father, his attorney did at some point refer him to a family law attorney, but Father could not remember what that attorney said. Father concluded that he had to "make the hardest decision of my life" and forgo seeing Brian because he perceived no other option given that he potentially faced the death penalty or life in prison. Father admitted that his choice to not see Brian was voluntary.

¶8 In accord with his decision, Father ceased all efforts to preserve his relationship with Brian after January 2016. Over the next six years, Father—who was out of custody for all but about five weeks—took no action to parent or support Brian.

¶9 It was not until after Father was acquitted in the criminal case that he began taking steps to establish a relationship with Brian. He did so by hiring a family law attorney and filing a family court action in March 2022 seeking to establish paternity, become Brian's primary residential parent with sole legal decision-making authority, and limit Mother to supervised parenting time.

¶10 In July 2022, Mother initiated this juvenile court action seeking termination of Father's parental rights based on abandonment and Brian's best interests under A.R.S. §§ 8-531(1) and -533(B)(1). Father entered a denial, and the matter proceeded to a four-day trial.

¶11 Mother testified that Brian has good relationships with her, his eighteen-year-old half-sister, his maternal grandmother, and Mother's fiancée, whom Mother had known for seven years and been in a relationship with for two years. Mother explained that Brian does not know

Father and is unaware of the biological connection. She explained that Brian has a parent-child type of relationship with her fiancée, who is willing to adopt him "right now at this moment." In a social study completed in early 2023, the evaluator concluded that Brian appeared to have close relationships with Mother, his half-sister, and his maternal grandmother, and noted that the half-sister thought highly of Mother's fiancée but was scared of Father because she remembered him as angry and aggressive. The evaluator recommended termination of Father's rights.

¶12　　　　In a detailed ruling, the juvenile court terminated Father's parental rights to Brian, finding that Mother proved abandonment and that termination was in Brian's best interests under A.R.S. §§ 8-531(1) and -533(B)(1). Father timely appealed.

## DISCUSSION

¶13　　　　A parent's right to custody and control of his or her own child, while fundamental, is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11–12 (2000). The juvenile court may terminate the parental relationship where (1) clear and convincing evidence shows the existence of a statutory termination ground under A.R.S. § 8-533, and (2) a preponderance of the evidence shows that termination is in the child's best interests. *Kent K. v. Bobby M.*, 210 Ariz. 279, 281–82, 288, ¶¶ 7, 41 (2005).

¶14　　　　We must accept the juvenile court's factual findings if supported by reasonable evidence and inferences, and we must affirm the court's legal conclusions unless they are clearly erroneous. *Brionna J. v. Dep't of Child Safety*, 533 P.3d 202, 209–10, ¶¶ 30–31 (2023). We do not reweigh the evidence. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). We review questions of statutory interpretation and application de novo, looking first to plain and unambiguous statutory language. *Id.* at ¶ 9.

### I.　　Abandonment

¶15　　　　Father first challenges the juvenile court's finding that he abandoned Brian. Abandonment is a ground for termination under A.R.S. § 8-533(B)(1). A.R.S. § 8-531(1) defines abandonment as "the failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision"—with "only minimal efforts to support and communicate with the child" constituting abandonment. A.R.S. § 8-531(1) further provides that the parent's "[f]ailure to maintain a normal parental relationship with the child without just cause

for a period of six months constitutes prima facie evidence of abandonment."

**¶16** A.R.S. § 8-531(1) measures abandonment based on conduct, not intent. *Michael J.*, 196 Ariz. at 249–50, ¶ 18. When the circumstances preclude the parent from "exercising traditional methods of bonding with his [or her] child, he [or she] must act persistently to establish the relationship however possible and must vigorously assert his [or her] legal rights to the extent necessary." *Id.* at 250, ¶ 22 (citation omitted). In other words, the parent must "do something, because conduct speaks louder than words or subjective intent." *Id.* (citation omitted). Even when a court order precludes or limits the parent's contact with the child, it is incumbent on the parent take some lawful action to maintain the relationship. *See In re Pima Cnty. Severance Action No. S-1607*, 147 Ariz. 237, 239 (1985) (noting that though father testified his visitation rights were restricted, he had stipulated to the dismissal of his petition to show cause why he should not have reasonable visitation rights); *In re C.R.*, 256 Ariz. 170, 174, ¶ 18 (App. 2023) (holding that abandonment finding was supported by father's failure to contest mother's order of protection or seek its modification to permit him to contact the children); *see also Calvin B. v. Brittany B.*, 232 Ariz. 292, 298, ¶¶ 27, 29 (App. 2013) (noting that father consistently tried to have contact with child, including by violating order of protection by texting mother to try to arrange visitation). Further, the fact that the parent may have to make difficult choices does not provide an automatic defense for inaction—even when the choice is between pursuing the parental relationship or following the advice of counsel to avoid risking criminal liability. *Cf. Minh T. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 76, 77–80, ¶¶ 1, 7, 10, 15–17 (App. 2001) (affirming severance where parents charged with murder of one child followed criminal counsel's advice to refuse to participate in reunification services for remaining children).

**¶17** Father does not dispute that sufficient evidence created a presumption under A.R.S. § 8-531(1) that he abandoned Brian: Father consciously failed to maintain any relationship with the child for more than six years. Father argues, however, that the termination should be reversed because he rebutted the abandonment presumption by showing "just cause" under the statute. We reject Father's argument.

**¶18** To the extent Father believes he presented a "just cause" showing as an exception to abandonment, he is mistaken—by the terms of the statute, a "just cause" showing is merely a rebuttal to a time-based presumption of abandonment. *See* A.R.S. § 8-531(1). Further, reasonable evidence supports the juvenile court's finding that Father failed to show

"just cause" for his decision to forgo the parental relationship. Father failed to pursue legal action to establish his parental rights and obligations for six years, choosing to follow the advice of his criminal counsel, whom he knew did not practice family or juvenile law.

**¶19**         Following his counsel's advice does not excuse Father's inaction. *See Minh T.*, 202 Ariz. at 78, 80, ¶¶ 7, 16. Father had to do *something* if he wanted to preserve the parental relationship, and instead he chose to do nothing. He made no meaningful effort to find a way to see or support Brian, directly or indirectly, with or without contact with Mother. Father's claims that it would have been futile to initiate a family court case or seek modification of his release conditions (if that was even necessary for access to Brian, who was neither a victim nor a witness) are entirely speculative. Even after meeting with a family law attorney, he never tried to establish paternity, obtain visitation, or provide any financial or other support for Brian. The juvenile court did not err by finding that Mother proved abandonment under A.R.S. §§ 8-531(1) and -533(B)(1) by clear and convincing evidence.

## II.     Best Interests

**¶20**         Father next challenges the juvenile court's finding that termination was in Brian's best interests. The best-interests inquiry focuses on the interests of the child, not the parent, with the primary concern being the child's interest in stability and security. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 12 (2018). Termination serves the child's best interests if it will benefit the child *or* if the denial of termination will harm the child. *Id.* at ¶ 13. The court is to consider the totality of the circumstances. *Id.* Relevant factors may include whether the child's needs are being met, *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 5 (App. 1998), and, even in private termination cases, the child's prospects for adoption, *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4–5, ¶¶ 16–17 (2016). While abandonment does not itself create a presumption that termination will serve the child's best interests, the consequences of abandonment should be considered. *See id.* at ¶¶ 14, 20; *see also Steven M. v. Dep't of Child Safety*, 254 Ariz. 426, 431, ¶ 16 (App. 2023) (affirming best-interests determination where, inter alia, evidence showed that children could be traumatized by contact with father because they did not think of him as their father and did not want to see him).

**¶21**         Father contends that the juvenile court erred by finding that a plan for Mother's fiancée to adopt Brian was "sufficiently in place and is not 'too speculative.'" We hold that reasonable evidence supported the

court's finding. Evidence showed that Mother and her fiancée had a long-term relationship. Evidence also showed that Mother's fiancée had a positive, parent-like relationship with Brian and wanted to adopt him. Father points out the fiancée was never interviewed, and that no inquiry was made into his eligibility to adopt Brian under A.R.S. § 8-105. But the evidence was sufficient to show at least the prospect of adoption.

¶22        Moreover, setting aside questions of adoption, the court reasonably found that termination was in Brian's best interests because introducing Father into his life would "damage [Brian]'s stability and security." Evidence showed that Brian's needs were being met by Mother and that Father had voluntarily made himself a complete stranger to the child, who knew nothing of him and was already eight years old at the time of the termination.

¶23        Father asserts that Mother is an untrustworthy person who wronged him. But even if that is true, the juvenile court was not compelled to conclude that Mother's conduct or character regarding Father meant that termination was not in Brian's best interests.

## CONCLUSION

¶24        The juvenile court did not err by finding that Father abandoned Brian and that termination was in Brian's best interests. We affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA