NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

RENE T., *Appellant*,

*v.*

CYNTHIA C., C.T., A.T., *Appellees*.

No. 1 CA-JV 19-0252
FILED 2-11-2020

Appeal from the Superior Court in Maricopa County
No. JS 19780
The Honorable Melody Harmon, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Denise L. Carroll Esq., Scottsdale
By Denise L. Carroll
*Counsel for Appellant*

Collins & Collins LLP, Phoenix
By Jonathan S. Collins, C. Robert Collins
*Counsel for Appellee, Cynthia C.*

**MEMORANDUM DECISION**

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Kent E. Cattani joined.

**C A M P B E L L**, Judge:

¶1        Rene T. ("Father") appeals the superior court's order severing his parental rights to his two children, A.T. and C.T. (the "Children"), based on the statutory ground of abandonment. He argues that he did not abandon the Children and that severance was not in their best interests. Because reasonable evidence supports the superior court's decision, we affirm.

**BACKGROUND**

¶2        Father has two children with Cynthia C. ("Mother"), a daughter born in 2007 and a son born in 2010. Mother and Father's relationship ended when Mother moved out of their shared home in February 2012. That summer, Mother began a new relationship with Johnny C. ("Stepfather"), whom she later married.

¶3        In August and September 2012, Father sent Mother a series of emails, many of which were vulgar, threatening, and derogatory. In response, Mother sought an Order of Protection for herself and the Children. Mother's affidavit for the Order of Protection described three times when Father stalked her at various locations, including her mother's home, her friend's home, and her office. Father searched for her, refused to leave her mother's home twice, and threatened to damage her property. On a separate occasion, Father entered Mother's house uninvited and began an argument which culminated in him shoving her. Based on this evidence, the court granted the Order of Protection in September 2012.

¶4        In October 2012, Father filed a petition for paternity, child custody, parenting time, and child support. He failed to appear at a hearing on the petition, however, and did not contact the court to state a reason for his absence.

¶5        Although Father was employed throughout 2012, he did not provide financial support for the Children that year. He also did not visit

the Children, because "he couldn't afford them [and] couldn't have them where he was residing."

**¶6** In January 2013, while on probation for a conviction for second degree facilitation of burglary, Father was arrested and charged with sexual assault. Father pled guilty to two counts of sexual abuse and the court sentenced him to a term in prison. Upon his release, Father was required to register as a sex offender and the court put him on lifetime sex offender probation, which includes a restriction that he not be around children.

**¶7** Father was in prison until August 2015. During his incarceration, Father did not provide financial support for the Children. Father exchanged cards and letters with the Children in 2013 but did not send cards, letters, or gifts after that time.

**¶8** After his release from prison in August 2015, Father maintained only minimal contact with the Children. In February 2016, Father was again arrested and, in August of that year, pled guilty to trafficking in stolen property. His guilty plea constituted an automatic violation of his sex offender probation. He was again sentenced to prison, this time for three years, and reinstated on lifetime intensive supervised sex offender probation upon his release.

**¶9** Although Father was employed during the six and a half months before he went back to prison, he did not provide any financial support for the Children. Father also failed to arrange support during his incarceration from February 2016 to October 2018. The Children did not see Father at all between 2015 and January 2019.

**¶10** Mother filed a petition seeking severance of Father's parental rights in October 2018 based on the statutory ground of abandonment and that termination would be in the Children's best interests. Mother asserted Stepfather wanted to adopt the Children and that they "know their Stepfather as their real Father." The court held a two-day severance hearing in May 2019.

**¶11** The evidence showed that the only financial support Father provided to the Children occurred after Mother filed the petition to terminate Father's parental rights. While testifying, Father admitted that even that support was not voluntarily provided, but rather collected through the garnishment of his paycheck. At the time of filing, Father had a support arrearage of over $20,000. He had not seen the Children since

2015, and had not exchanged any cards, letters, or gifts with the Children since 2013.

¶12        At the time Mother filed the petition, Father was on Intensive Supervised Sex Offender Probation Services ("IPS"). Father testified that upon completion of IPS, he intended to support the Children and spend time with them. However, he admitted, "it's going to be difficult" because he will be on sex offender probation and "can't be in certain places with them [without] permission . . . ." Father explained that, through his IPS, he needs to complete psychological evaluations, classes, and risk assessments before he sees the Children again. That process could take, at minimum, five or six additional months after his release, and his successful participation remains speculative.

¶13        The court found that Mother had established a prima facie case, and that Father had not presented sufficient evidence to overcome the rebuttable presumption of abandonment. The court also found that severance was in the best interests of the Children and terminated Father's parental rights. Father timely appealed.

## DISCUSSION

¶14        The right to custody of one's child is fundamental, but not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶ 12 (2000). The superior court may terminate parental rights if it finds clear and convincing evidence of one of the statutory grounds under A.R.S. § 8-533(B) and a preponderance of the evidence showing termination would be in the best interests of the children. *Id.*; *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005).

¶15        The superior court is entrusted with a great deal of discretion in weighing and balancing the interests of the children, parents, and state. *Cochise Cty. Juv. Action No. 5666–J*, 133 Ariz. 157, 160 (1982). As the trier of fact, the superior court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009) (internal quotation omitted). We will not disturb the court's termination of parental rights unless the factual findings are clearly erroneous—that is, unless no reasonable evidence exists to support them. *Minh T. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 76, 78–79 (App. 2001). This court interprets the evidence and reasonable inferences in the light most favorable to affirming the court's order. *Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 207, ¶ 2 (App. 2008).

4

## I.    Abandonment

**¶16**        At issue here, a statutory ground for termination arises when "the parent has abandoned the child." A.R.S. § 8-533(B)(1). Father argues the superior court erred in finding he abandoned the Children.

**¶17**        Abandonment is defined by statute as:

> [T]he failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. Abandonment includes a judicial finding that a parent has made only minimal efforts to support and communicate with the child. Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment.

A.R.S. § 8-531(1). No "bright line formula [has] developed to determine whether a parent abandoned an existing relationship." *Pima Cty. Juv. Severance Action No. S-114487*, 179 Ariz. 86, 96 (1994). Abandonment is measured "not by a parent's subjective intent, but by the parent's conduct." *Michael J.*, 196 Ariz. at 248, ¶ 18.

### A.    Prima Facie Case

**¶18**        Father argues that Mother failed to establish a prima facie case of abandonment. He maintains he had "just cause" for any failure "to maintain a normal parental relationship with the [Children]." He argues that any estrangement is the result of the actions of Mother and Stepfather. He points to Mother getting an order of protection and Mother's refusal to let paternal grandmother ("Grandmother") facilitate his contact with the Children. The record does not support Father's argument.

**¶19**        "[W]hen circumstances prevent the . . . father from exercising traditional methods of bonding with his child, he must act persistently to establish the relationship however possible and must vigorously assert his legal rights to the extent necessary." *Michael J.*, 196 Ariz. at 250, ¶ 22 (2000) (internal quotation omitted). Incarceration provides neither a legal defense to abandonment nor alone justifies termination based on abandonment, but it is one factor to consider in evaluating parents' ability to perform their parental obligations. *Id.* Courts "should look to see whether the parent has taken steps to establish and strengthen the emotional bonds linking him or her with the child." *Kenneth B. v. Tina B.*, 226 Ariz. 33, 37, ¶ 21 (App. 2010). Here, Father has not taken the requisite measures.

**¶20** The court expressly found that Mother established a prima facie case of abandonment, demonstrating that Father failed to maintain a normal parental relationship for a period of over six months. Mother testified that since Father returned to prison in February 2016, he has had no contact with the Children. Even though conduct during incarceration is not determinative, *Michael J.*, 196 Ariz. at 250, ¶ 22, the record reflects two other periods of time when Father failed to maintain a normal parental relationship for over six months.

**¶21** First, Mother testified that Father was not very involved in the Children's lives for almost a year, beginning when the couple separated in February 2012, and continuing through Father's incarceration for sexual abuse in January 2013. Father did not help "at all" throughout this period of almost one year.

**¶22** Later, when Father was released from prison for six and a half months from August 2015 to February 2016, Father rarely saw the Children. Even when it was his scheduled weekends to see the Children, Father would often decline to exercise his custody rights because "he couldn't afford them," "couldn't pick them up," or "had no place to keep them."

**¶23** Father failed to maintain a normal parental relationship for over six months in each of these timeframes, even though his opportunity to "strengthen the emotional bonds linking him" with the Children was not constrained by incarceration.

**¶24** To the extent Father argues that Mother actively limited his access to the Children, Mother's testimony belies this assertion. Mother specifically testified "I wasn't keeping . . . the [C]hildren from him." Mother admitted she would sometimes decline Grandmother's requests to bring the Children to see Father, but explained it was because Grandmother made "last minute" requests when the Children were already committed to their own social and scholastic activities. When there is a conflict in the evidence, the superior court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004). We will not reweigh evidence, but rather we view all evidence and reasonable inferences therefrom in the light most favorable to affirming the court's order. *Jordan C.*, 223 Ariz. at 93 ¶ 18. Therefore, reasonable evidence supported the court's express finding that Mother presented a prima facie case demonstrating Father's abandonment of the Children.

### B. Reasonable Support, Regular Contact, and Normal Supervision

¶25        The superior court found that "Father has failed to undertake any of the myriad of responsibilities associated with parenting but has left those obligations to others to fulfill." Father argues the court erred in making this finding because the evidence showed that he "made more than minimal efforts to support and communicate with the Children." We disagree.

¶26        Since Mother and Father separated in 2012, Father maintained little contact with the Children and provided them with very minimal, if any, financial, emotional or parental support. Father has not seen the Children since 2015, and has not exchanged cards, gifts, or letters with them since 2013. Father did not begin paying any child support until after Mother filed the severance petition in October 2018, and he is currently in arrears in an amount of over $36,000.

¶27        During his testimony, Father admitted that he has not attended any of the Children's doctor's appointments, sporting events, school performances, musical assemblies, or school appointments such as parent-teacher conferences. When Father filed his petition for paternity, child custody, parenting time and child support, Father did not even attend his own hearing, and did not provide the court any reason for his absence.

¶28        Given these facts, reasonable evidence supports the superior court's finding that Father abandoned the Children.

## II.   Best Interests of the Children

¶29        Father argues that Mother presented insufficient evidence to support the court's best interests finding. We disagree. In considering whether termination of parental rights is appropriate, the superior court must find termination is in the children's best interests by a preponderance of the evidence. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 149–50, ¶ 18 (2018).

¶30        Termination of parental rights is in the children's best interests if termination would benefit the children or if continuation of the relationship would harm the children. *Aleise H. v. Dep't of Child Safety*, 245 Ariz. 569, 572, ¶ 9 (App. 2018) (internal citation omitted). Once the court's focus shifts to a best interests analysis, the "foremost concern is protecting a child's interest in stability and security." *Id.* (internal quotations omitted). The superior court also considers whether the current placement is meeting

the children's needs and whether the placement wants to adopt the children. *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 5 (App. 1998) (internal citations omitted).

¶31　　　　Here, reasonable evidence supports the court's finding that termination would be in the Children's best interests. Since mid-2012, Mother and Stepfather have provided a stable, safe, family-oriented environment for the Children. Stepfather intends to adopt the Children, pending the resolution of this severance proceeding.

¶32　　　　Stepfather has been financially and emotionally supportive of the Children. Stepfather has paid for housing and clothing for the Children. He has taken the older child to her National Junior Honor Society meetings on a weekly basis. Stepfather has taken the younger child to his sporting events, including wrestling practice three times per week, and has coached the child's football games. Stepfather has also attended parent-teacher conferences at the Children's schools. Stepfather attended a father-daughter dance at the older child's school, even though Father was not incarcerated at the time. Both Children are getting "very good grades . . . all A's and B's." Stepfather and Mother have a child together, with whom the Children share a "really close bond," and six pets the Children help take care of. The Children refer to Stepfather as "dad."

¶33　　　　Stepfather testified that he saw the Children as his own, and that he believed the Children feel the same. Stepfather intends to adopt the Children to "complete" the family, and the Children have reportedly "expressed a desire for [Stepfather] to adopt them." Furthermore, severing Father's parental rights, and in turn allowing Stepfather to adopt the Children, would enable the Children to receive healthcare benefits through Stepfather's job as a police officer, a benefit Father has never provided.

¶34　　　　Based on this information, the superior court found that Mother proved it would be in the Children's best interests to sever Father's parental rights, and reasonable evidence supports this finding.

## CONCLUSION

¶35    For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:  AA